# 12-4497-cv

## United States Court of Appeals
## for the Second Circuit

───────────────────────────────────────────

**M. PETER KUCK** and **JAMES F. GOLDBERG**,

*Plaintiffs-Appellants,*

*v.*

**JOHN A. DANAHER III**, *in his Individual Capacity,* **ALBERT J. MASEK**, *in his Individual Capacity,* **ALARIC FOX**, *in his Individual Capacity,* **BARBARA MATTSON**, *in her Individual Capacity,* **THOMAS KARANDA**, *in his Individual Capacity,* **RONALD A. BASTURA**, *in his Individual Capacity,* **CHRISTOPHER A. ADAMS**, *in his Individual Capacity,* **T. WILLIAM KNAPP**, *in his Official Capacity as Secretary, Connecticut State Board of Firearms Permit Examiners,* and **JOSEPH CORRADINO**, *in his Official Capacity as Chairman, Connecticut State Board of Firearms Permit Examiners,*

*Defendants-Appellees,*

**JAMES M. THOMAS**, *in his Official Capacity,* **M. JODI RELL**, *in her Individual and Official Capacities,* and **SUSAN MAZZOCCOLI**, *in her Individual Capacity,*

*Defendants.*

On Appeal from the United States District Court
for the District of Connecticut (New Haven)

## BRIEF FOR PLAINTIFFS-APPELLANTS

RACHEL M. BAIRD
CRAIG M. LOVELY
RACHEL M. BAIRD & ASSOCIATE
8 Church Street, Suite 3B
Torrington, Connecticut 06790-5247
Tel: (860) 626-9991
*Attorneys for Plaintiffs-Appellants*

*To Be Argued By:*
RACHEL M. BAIRD

# <u>TABLE OF CONTENTS</u>

Table of Authorities ........................................................................ iii

Jurisdictional Statement ...................................................................1

Statement of Issues Presented for Review .............................................3

Preliminary Statement of the Case........................................................4

Statement of Relevant Facts ...............................................................9

I.  The Board Must Hold Law Enforcement Accountable For State Permitting Decisions……………………………………………………………….9

    A.  State Audits of the Board Cautioned Against Due Process Violations………………………………………………………11

    B.  Board Secretary T. William Knapp Exercises Authority with Limitations to Address Backlog……………………………………..14

    C.  Chairman Christopher A. Adams Delegated the Authority of the Board to Its Administrator with Negative Results …………………18

II.  The State Police Abuse Their Discretion in Revoking State Permits………21

    A.  Goldberg's June 27, 2007, Revocation and the Seizure of His Permit……………………………………………………………….21

    B.  The State Police Revoke Goldberg's State Permit Absent Investigation…………………………………………………………24

Argument...................................................................................29

I.  Standard of Review………………………………………………...29

II.  The Voluntary Limitations of the Board Cannot Justify the Deprivation of a State Permit as a Means of Defense………..……………………………30

    A.  Overview of the Board and Procedural Due Process…………..……30

B.    The Individual's Interest in a State Permit Prevails in the <u>Mathews v. Eldridge</u> Test……………………………………..……………… 35

        1.    <u>Krimstock v. Kelly</u>- Probable Cause not Adequate Guarantee………………………………..………..35

        2.    <u>Mathews v. Eldridge</u> – The Due Process Test……….. .36

               *i.*    First <u>Mathews</u> Factor…………………….…..…37

C.    The Government's Interest in Revoking a State Permit Does not Provide the Protections Asserted…………………………..…..41

D.    The State Police Had Prior Knowledge of the Delay but were Deliberately Indifferent………………………………………..…….42

E.    <u>B&B Target Center</u>, <u>Gershenfeld</u>, <u>Walters,</u> and <u>Spinelli</u>……...……..43

III.    The Absence of an Investigation Prior to Revocation Not Only Fails to Justify the Need For a Lengthy Delay in Scheduling a Hearing But Violates State Law……………………………………………………….……..46

IV.    State Law Does Not Authorize Local Police Departments to Seize State Permits…………………………………………………………………...47

Conclusion ....................................................................................................48

Certificate of Compliance with F.R.A.P. 32(a)…………………………………...49

# TABLE OF AUTHORITIES

## CASE LAW

B&B Target Center, Inc. v. Figueroa-Sancha,
871 F.Supp.2d 71 (P.R. 2012) ...…………………………………...........……  43

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)…………………………………………………………30

Connecticut v. Doehr,
501 U.S. 1 (1991)………………………………………………………...…34

DeFabio v. East Hampton Union Free School Dist.,
623 F.3d 71 (2d Cir.2010)……………………………………………………...30

District of Columbia v. Heller,
554 U.S. 570 (2010)…………………………………………………………32

Ezagui v. City of New York,
726 F.Supp.2d 275 (S.D.N.Y. 2010).………………………………………… 21

Fishbein v. Kozlowski,
252 Conn. 38 (1999)………………………………………………………….8

Gallo v. Prudential Residential Servs., Ltd.Partnership,
22 F.3d 1219 (2d. Cir.1994)………………………………………………30

Gershenfeld v. Justices of the Supreme Court of Pennsylvania,
641 F.Supp.2d 1419 (E.D. Pa.  1986)…………………………………..44

Hernandez v. Coughlin,
18 F.3d 133 (2d Cir. 1994)………………………………………………..34

Hickey v. Commissioner of Motor Vehicles,
170 Conn. 136 (1976)…………………………………………………………8

Interboro Inst., Inc. v. Foley,
985 F.2d 90 (2d Cir.1993)………………………………………..…33

Jones v. City of Modesto,
408 F.Supp.2d 935 (E.D. Ca. 2005)……………………………………………45

Karpova v. Snow,
497 F.3d 262 (2d Cir. 2007)……………………………………………………32

Kentucky Dept. of Corrections v. Thompson,
490 U.S. 454 (1989)……………………………………………………………33

King v. Simpson,
189 F.3d 284 (2d Cir.1999)……………………………………………………30

Krimstock v. Kelly,
306 F.3d 40 (2d Cir. 2002)……………………………………………………35

Leebaert v. Harrington,
332 F.3d 134 (2d Cir. 2003)……………………………………………………34

Logan v. Zimmerman Brush Co.,
455 U.S. 422 (1982)……………………………….........................…  ..…..35

Mathews v. Eldridge ,
424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ……………………...… 36

Mullane v. Cent. Hanover Bank & Trust Co.,
339 U.S. 306 (1950)…………………………………………………….....32

New Windsor Volunteer Ambulance Corps, Inc. v. Myers,
442 F.3d 101 (2d Cir. 2006)……………………………………………………34

Sealed v. Sealed,
332 F.3d 51 (2d Cir. 2003)…………………………………………………..34

Spinelli v. City of New York,
579 F.3d 160 (2d Cir. 2009)……………………………….........................45

Tenenbaum v. Williams,
193 F.3d 581 (2d Cir.1999)……………………………………………………29

iv

<u>Villager Pond, Inc. v. Town of Darien</u>,
56 F.3d 375 (2d Cir.1995)……………………………………………….. 30

<u>Walters v. Wolf</u>,
660 F.3d 307 (C.A. Mo. 2011)………………………………………... 44

<u>Winstead v. District of Columbia</u>**,**
840 F.Supp.2d 149 (D.C. 2012) ……………………………………… 42

<u>Zinermon v. Burch</u>,
494 U.S. 113 (1990)…………………………………………………… 34

## STATUTORY AUTHORITY

<u>Conn</u>. <u>Gen</u>. <u>Stat</u>. § 14-227b…………………………………………….. 7

<u>Conn</u>. <u>Gen</u>. <u>Stat</u>. § 29-28(b) …………………………………………… 9

<u>Conn</u>. <u>Gen</u>. <u>Stat</u>. § 29-28(e)…………………………………………… 24

<u>Conn</u>. <u>Gen</u>. <u>Stat</u>. § 29-28 …………………………………………….. 39

<u>Conn</u>. <u>Gen</u>. <u>Stat</u>. § 29-35 ……………………………... ………..24

42 U.S.C. §1983 ……………………………………………………… 2

28 U.S.C. §§ 1331,1343(a)(4)...……………………………………… 2

## FEDERAL RULES

Fed. R. Civ. P. 56……………………………………………………30

## JURISDICTIONAL STATEMENT

This is an appeal brought by Plaintiffs M. Peter Kuck and James F. Goldberg from an October 18, 2012, final judgment of the United States District Court for the District of Connecticut, Vanessa L. Bryant, Judge, entered in favor of Defendants John A. Danaher III, Albert J. Masek, Jr., Alaric Fox, Barbara Mattson, Thomas Karanda, Ronald A. Bastura, Christopher A. Adams, in their individual capacities, and T. William Knapp and Joseph Corradino, in their official capacities as the Secretary and Chairman, respectively, of the Connecticut State Board of Firearms Permit Examiners, disposing of all claims in Counts One through Four of a consolidated Second Amended Complaint. (SPA 147)

Plaintiffs appeal from Orders of the district court: (1) Granting, on October 16, 2012, summary judgment in favor of Defendants Adams, Knapp, and Corradino on Counts One and Two of Kuck and Goldberg's consolidated Second Amended Complaint (JA 120-175) alleging denial of procedural due process in violation of the Second, Fifth, and Fourteenth Amendments to the United States Constitution brought pursuant to 42 U.S.C. § 1983 (SPA 110-136); (2) Dismissing, on September 29, 2011, Count Two of Kuck's Amended Complaint (JA 19-59) and Count Two of Goldberg's Amended Complaint (JA 60-113) brought against Defendants Danaher, Fox, Masek Mattson, Karanda, and Bastura alleging denial of procedural due process in violation of the Second, Fifth, and Fourteenth

1

Amendments to the United States Constitution brought pursuant to 42 U.S.C. §

1983 (SPA 39-63); (3) Granting, on October 16, 2012, summary judgment in favor

of Defendants Danaher, Fox, Masek, Mattson, Karanda, and Bastura on Count

Three of Kuck and Goldberg's consolidated Second Amended Complaint (JA 120-

175) alleging denial of procedural due process in violation of the Second, Fifth,

and Fourteenth Amendments to the United States Constitution brought pursuant to

42 U.S.C. § 1983 (SPA 141-144); and (4) Granting, on October 16, 2012, summary

judgment in favor of Defendants Danaher, Fox, Masek, Mattson, Karanda, and

Bastura on Count Four of Kuck and Goldberg's consolidated Second Amended

Complaint (JA 120-175) alleging the illegal seizure of Goldberg's property in

violation of the Fourth and Fourteenth Amendments to the United States

Constitution brought pursuant to 42 U.S.C. § 1983 (SPA 144-146)

The jurisdiction of the district court over the cause of action derived from 42

U.S.C. §§ 1983, 1988, and 28 U.S.C. §§ 1331, 1343(a)(3) and (4). A timely Notice

of Appeal docketed in the district court on November 8, 2012. (JA 205-206)

2

## **STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

I.    Did the district court err in finding no genuine issues of material fact exist from which a reasonable fact finder could determine that the delay in Kuck's and Goldberg's post-derivation hearings after being deprived of their state permits to carry pistols or revolvers in self-defense violated their rights to due process?

II.   Did the district err in finding that a ten month wait period between the deprivation of individuals' state permits and their hearings to appeal the deprivations, when state auditors cautioned that more than ninety days presented a potential due process violation and state law mandates that hearings convene every ninety days, does not violate rights to due process?

III.  Did the district court err in finding no genuine issues of material fact exist from which a reasonable fact finder could determine that the state police failed to investigate the circumstances of Goldberg's state permit revocations prior to revocation?

IV.   Did the district err in finding no genuine issues of material fact exist from which a reasonable fact finder could determine that the state police condoned the unlawful seizure of Goldberg's state permit by the Glastonbury Police Department and then continued to hold the state permit unlawfully prior to revocation?

## PRELIMINARY STATEMENT OF THE CASE

This Court heard separate appeals in 2009 from Kuck and Goldberg arising from the same facts and claims brought now in this current appeal following consolidation of their cases in the district court after remand.

Kuck and Goldberg appealed previously from the dismissal of their complaints alleging a due process violation in the wait period from the time their state permits were not renewed and revoked, respectively, by the state police until their appeals from the decisions were heard by the Board of Firearms Permit Examiners ("Board"). Kuck v. Danaher, 600 F.3d 159 (2d Cir. 2010) (SPA 148-156); Goldberg v. Danaher, 599 F.3d 181 (2d. Cir. 2010) (SPA 157-159). Goldberg also brought a separate due process claim alleging a failure by the state police to investigate prior to revocation and a Fourth Amendment claim alleging the unlawful seizure by the state police of his state permit prior to revocation. (JA 169-173)

Prior to oral argument in the 2009 Kuck and Goldberg appeals, this Court issued a decision in Spinelli v. City of New York, 579 F.3d 160 (2d. Cir. 2009), and asked the parties to submit a letter pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure. Kuck and Goldberg asserted that the findings and conclusion in Spinelli supported their due process claims bought pursuant to the Fifth and Fourteenth Amendments of the United States Constitution.

4

"Even a brief and provisional deprivation of property pending judgment is of constitutional importance." Spinelli, 579 F.3d at 174. The deprivation period in Spinelli was fifty-eight days. The state police returned Goldberg's permit four-hundred-and-fifty-eight days after revocation. The Board reinstated Kuck's permit five-hundred-and-fifty-four days after expiration.

The 2010 Kuck appellate decision held that Kuck's complaint plausibly stated a procedural due process claim and remanded to the district court to consider, in the first instance, whether any relief was available to Kuck or any putative class in light of the proposed amended complaint. Kuck, 600 F.3d at 161; see also Goldberg, 599 F.3d at 181 (remanded on procedural grounds for district court to consider the pleadings in granting motion to dismiss). "It remains to be seen, however, whether Kuck has named, or will be able to name, the appropriate defendants." Id. at 167. Kuck and Goldberg, after remand, each filed an Amended Complaint. (JA 19-59; JA 60-113) The district court granted in part and denied in part the Defendants' motion to dismiss allowing Kuck and Goldberg to file a consolidated Second Amended Complaint (JA 120-175) in four counts against Adams, Danaher, Masek, Fox, Mattson, Karanda, and Bastura, in their individual capacities, and against the current Board chairman and secretary in their official capacities. The Second Amended Complaint sought, in addition to damages against the individual Defendants:

5

> Prospective injunctive relief against the Connecticut
> State Board of Firearms Permit Examiners Chairman
> Corradino and Secretary Knapp including, but not limited
> to, Court oversight of the Board's scheduling of appeals
> to protect the rights of Connecticut citizens to keep and
> bear arms.

(JA 174) An Answer was filed on December 2, 2011. (JA 176-201) In granting

summary judgment in favor of Board Chairman Corradino and Secretary Knapp

the district court found no constitutional violation in the delay experienced by

individuals whose permits had been denied or revoked and property interests

deprived as:

> The factual record demonstrates that the Board made
> good faith efforts to cope with their delay problem under
> resource constraints occasioned by the significant
> increases in appeal requests and an all, volunteer board
> which had the prospect of future progress in reducing the
> delay. Indeed, these very efforts did successfully
> decrease the delay from 16 months in 2008 to 10.5
> months in 2010.

(JA 134) The reverse of this finding is that the State of Connecticut, acting through

its Board, relegates the property interest held by individuals in their state permits to

the good will of volunteers who may or may not have the resources to adequately

impart the process due under the United States Constitution. Whether progress has

been made in decreasing the backlog (and that progress coincides with the

pendency of this lawsuit since September 2007 when dramatic changes

commenced at the Board with the 2008 departure of former Chairman Adams)

even the current Board secretary views the delay as too long and state auditors have warned for years that a delay beyond ninety days may constitute a due process violation. Notwithstanding the current composition of the Board there are no laws in place and no structure of accountability which require the Board to hold hearings but every ninety days. The delay is too long now to meet constitutional scrutiny. In the absence of accountability there is no guarantee, and in fact it is likely, that the delays of five-hundred-and-fifty-four days and four-hundred-and-fifty-eight days, experienced by Kuck and Goldberg, respectively, will occur again.

In Connecticut, a motor vehicle operator arrested for driving under the influence of alcohol or drugs is afforded a pre-deprivation hearing prior to the suspension of his motor vehicle license with limited exceptions.  Conn. Gen. Stat. § 14-227b.[1] The operator receives a notice that his license will be suspended in

---

[1] The due process afforded a motor vehicle is exhaustive and detailed. Section 14-227b(e)(1) provides: "Except as provided in subdivision (2) of this subsection, upon receipt of such report, the Commissioner of Motor Vehicles may suspend any license or nonresident operating privilege of such person effective as of a date certain, which date shall be not later than thirty days after the date such person received notice of such person's arrest by the police officer. Any person whose license or operating privilege has been suspended in accordance with this subdivision shall automatically be entitled to a hearing before the commissioner to be held prior to the effective date of the suspension. The commissioner shall send a suspension notice to such person informing such person that such person's operator's license or nonresident operating privilege is suspended as of a date certain and that such person is entitled to a hearing prior to the effective date of the suspension and may schedule such hearing by contacting the Department of Motor Vehicles not later than seven days after the date of mailing of such suspension notice." (emphasis added.) The state interest is ensuring that intoxicated motor

thirty days and is afforded seven days to contact the motor vehicle department to

schedule a hearing. The hearing is held prior to the expiration of the thirty-day

period scheduled for suspension and a decision rendered. Id.  In consideration of

Heller v. District of Columbia, 554 U.S. 570 (2010) the revocation of a pistol

permit is due no less process. See Fishbein v. Kozlowski, 252 Conn. 38, 50 (1999)

("Our narrow reading of the probable cause requirement in subsection (f) is fully

consistent with the requirements of due process. We are persuaded that the statute's

probable cause requirement, coupled with its provision for an administrative

hearing, affords a driver all the constitutional protection to which he is entitled.

Due process requires that '[a] state must afford notice and opportunity for hearing

appropriate to the nature of the case before the [license suspension] becomes

effective.") (Internal quotation marks omitted) (citing Hickey v. Commissioner of

Motor Vehicles, 170 Conn. 136, 144 (1976)).

The property interests Kuck and Goldberg possess in their right to carry

outside the home for self-defense and their right to do so under the Second

Amendment cannot be subject to the good will of a Board with the justification

that they are volunteers and do their best. See Madison, James. Federalist No. 51:

"The Structure of the Government Must Furnish the Proper Checks and Balances

---

vehicle operators do not drive and injure or kill others on the roadway. Still, a pre-deprivation hearing is afforded.

8

Between the Different Departments." *New York Packet,* February 8, 1788 ("If men were angels, no government would be necessary.").

## STATEMENT OF FACTS

### I. THE BOARD MUST HOLD LAW ENFORCEMENT ACCOUNTABLE FOR STATE PERMITTING DECISIONS

The discretion of the state police to deny a renewal application for a state permit or to revoke a state permit is subject to the statutory standard of just or proper cause. See Conn. Gen. Stat. § 29-32(b). (SPA 173) Individuals hold permits conditioned upon "suitability" and ten eligibility factors. See Conn. Gen. Stat. § 29-28(b). (SPA 165-166) The Board reviews actions taken by local issuing authorities to deny temporary state permits and by the state police to revoke or deny renewal of state permits. The Board orders the issuance, renewal, or reinstatement of the state permit unless it finds that the denial or revocation would be "for just and proper cause." Conn. Gen. Stat. § 29-32b(b).  (SPA 175-176)

If an individual is ineligible under any one of the ten factors enumerated in section 29-28(b), the Board may not order issuance, renewal, or reinstatement of a state permit to a person because the person is statutorily ineligible. Therefore, the Board only exercises its discretion in appeals from denials and revocations based on a finding by the local issuing authority or the state police that an individual is not suitable. Kuck and Goldberg, as valid state permit holders, held protected property interests in their permits at the time of deprivation. (JA 174)

In conducting discovery after remand the first inquiry was to determine the liability of the state police defendants in denying Kuck and Goldberg their right to due process and their right to carry a pistol or revolver.

*The State Police Defendants*

- Commissioner John A. Danaher III served as the Commissioner of the Department of Public Safety (currently, the Department of Emergency Services and Public Protection") ("state police") from March 5, 2007 to May 10, 2010. (JA 177)

- Albert J. Masek, Jr. supervised the state police firearms unit at the rank of captain. (JA-177)

- Alaric Fox was a state police lieutenant and reported to Commissioner Danaher about various state police firearms matters. (JA 177)

- Barbara Mattson is a state police detective assigned to the firearms unit since 2000. (JA 314)

- Thomas Karanda served in the state police firearms unit as a detective in 2007 and 2008. (JA 178)

- Ronald Bastura served in the state police firearms unit as its executive director at the rank of sergeant. (JA 177)

The second inquiry was to determine the liability of the Board in providing

the process due to individuals deprived of their right to carry by government

officials.

*The Board Defendants*

- Christopher Adams was the Board chairman from August 2005 until he

resigned in July 2008. (JA 218)

- T. William Knapp is the current secretary of the Board. (JA 556)

- Joseph Corradino is the current chairman of the Board. (JA 556)

## A.    State Audits Of The Board Cautioned Against Due Process Violations

The state Auditors of Public Accounts completed four reports for fiscal years

ending 2001 through 2010:[2]

- Auditors' Report, Fiscal Years Ended June 30, 2001 and 2002 (JA 470-481)

The report identified three causes for the increase in the hearing wait period

from three months in July 2000 to fourteen months in January 2003. First, an

increase in requests for permits after September 11, 2001. Second, an increase in

denials of temporary state permits at the local issuing authority level. Third, the

Board's failure to increase the number of hearing dates or the number of appeals

---

[2] The statistics in the Second Amended Complaint at paragraphs 191-194 are in a June 15, 2007, email from Mazzoccoli to Adams regarding the number of resolved and new cases. (SPA 117-118; JA 33-34; JA 581-585)

heard at each hearing to meet the escalating demand. (JA 474)

The auditors recommended that the Board "establish a standard that provides for a reasonable time period between the receipt of the appellant's request for an appeal and the scheduled hearing, and should adjust its scheduled hearing dates and numbers of cases heard to meet that standard." (JA 475) The auditors cautioned the "length of the delay between the receipt of a request for an appeal and the hearing of the appeal, may be considered a denial of the appellant's right to a timely hearing." (JA 475)

- Auditors' Report, Fiscal Years Ended June 30, 2003 and 2004 (JA 482-498)

The report identified a fourteen-month delay for cases to be closed through hearing, withdrawals, or state police settlements for the 296 cases pending in May 2005 and noted that the Board had not "increased either the number of appeals scheduled at each hearing or the frequency of the hearings." (JA 486)  The auditors cautioned that the "length of the delay between the receipt of a request for an appeal and the related hearing or negotiated DPS settlement may be considered a denial of the appellant's right to a timely hearing." (JA 487) The Board responded that it lacked the statutory authority to establish or enforce "standards for its members' attendance at hearings and the number of members necessary for a quorum." (JA 488)

- Auditors' Report, Fiscal Years Ended June 30, 2005, 06, 07, and 08 (JA 499-514)

Adams resigned and was replaced by Corradino as Board chairman in August 2008. (JA 218) In August 2008 there were 407 cases pending. The auditors estimated "approximately 16 months for these cases to be closed through hearings, withdrawals, or Department of Public Safety settlements." (JA 503) The state auditors did note progress when they drafted the report on June 9, 2009, for fiscal years ending in 2005-2008 in the establishment of a subcommittee of the Board "primarily to address the backlog and to recommend updating the Board regulations." (JA 505) "On July 10, 2008, at the recommendation of the Board's subcommittee, the Board decided to increase the annual number of meetings from twelve to sixteen to reduce the backlog." (JA 505) The Board still had not "established minimum standards for its members' attendance at hearings and the number of members necessary for a quorum." (JA 506)

- Auditors' Report, Fiscal Years Ended June 30, 2009 and 10 (JA 515-527)

The number of Board hearings held annually increased from eleven in fiscal years 2005-2008 to sixteen in 2009 and eighteen in 2010. The more frequent meetings over the audited period resulted in a decrease in the case backlog from 407 in August 2008 to 284 as of June 30, 2010. (JA 519) Over that same time period, the estimated number of months needed to clear the backlog decreased

13

from approximately sixteen months to ten and one-half months. (JA 519) The auditors described the decrease as a "marked improvement" but added that "additional effort will be required by the Board to reduce the estimated ten and one-half month backlog to an "acceptable level," specifically ninety days or less. (JA 520) The auditors cautioned in August 2011, when the report was written, that the ten and one-half month delay "between the receipt of a request for an appeal and the related hearing or negotiated DPS settlement may be considered a denial of the appellant's right to a timely hearing." (JA 520)

### B.   Board Secretary T. William Knapp Exercises Authority With Limitations To Address Backlog

T. William Knapp ("Chief Knapp") joined the Board on March 11, 2008, (JA 553) as the appointed nominee of the Connecticut Police Chiefs Association (CPCA). Conn. Gen. Stat. § 29-32b(a). (SPA 175) He retired from the Wethersfield Police Department in 1989 (JA 342:10-17) after serving as the police chief for the last fifteen-years of his thirty-two year career. (JA 341:4-5) During his time on the Board he has held respected positions as a member of the CPCA, the Wethersfield Conservation Commission, the Wethersfield Economic Development Commission, and the Winsted Civil Service Commission. (JA 340:15-24; JA 341:14-16) In 1985-86, Chief Knapp was the President of the CAPC. (JA 345:21-21) Chief Knapp was the Executive Director of the Police Officers Standards and Training (POST) Council during the tenures of Governor William O'Neill and

14

Governor Lowell P. Weicker, Jr. (JA-343:7-17) <u>See</u> <u>Conn.</u> <u>Gen.</u> <u>Stat.</u> § 7-294d

(setting forth the POST Council powers to certify police officers, police training

schools and, law enforcement instructors in state municipalities and provide

training for municipal police departments). While he was POST Council President,

Chief Knapp convinced the POST Council Board of Directors to develop a formal

process for selecting police chiefs and since then has been involved in many

municipal police chief selection processes. (JA 347:2-21)

Goldberg's appeal from his permit revocation may have been Chief Knapp's

first awareness of the backlog of cases after he was seated as a member of the

Board. (JA 354:9-11) In July 2008 when Chairman Corradino asked Chief Knapp

to become Board secretary, Chief Knapp drafted discussion notes prior to his

meeting with the chairman. These notes handwritten by Chief Knapp, dated July

18, 2008, stated foremost at the top of the page:

> My feelings/knowledge/awareness of what they are
> doing, how manipulating they are in using the waiting
> period to punish things they have no right to do and it
> causes injustice to innocent, honest people! That offends
> me! My challenge! Don't expect you agree but my
> challenge to stop it! Incomprehensible that
> Commissioner (not this one! Not anyone!) does not have
> – has not ordered Guidelines for (1) Course (2) Locals
> (3) SLFU [DESPP Special Licensing and Firearms Unit].

(JA 619) The state police did not always investigate prior to revoking a state

permit. (JA 372:7-12) When the state police are preparing to go before the Board

15

that is when they gather the documents from the municipal police department as evidenced by the fax transmission dates in the packets presented to the Board members which show the documents received within the past ten or fifteen days rather than nineteen or so months previous when the revocation occurred. (JA 372:1-3)

Once he became secretary, Chief Knapp implemented a system to provide the firearms unit copies of the questionnaires completed by appellants so that more cases could be resolved and permits returned where there was not sufficient evidence for the state police to prevail at a Board hearing. This replaced the former system which allowed appeals to be submitted to the Board where they would stagnate until immediately prior to the hearing when the firearms unit would finally review the appeals and often reinstate unilaterally. (JA 356:55:13-56:16)

When Chief Knapp provided fifty or so questionnaires at a time to Sergeant Douglas Hall and Trooper Thomas Hatfield in the firearms unit and they reviewed the questionnaires, it was the first time they had heard the appellant's side of the story and it would have raised questions in their minds such that "[either clearly the appellant's side of the story wins and we want to get that permit back to him or her as fast as possible even if we have to hand-deliver it within the hour, or something that they ought to get ahold of the handler of the original investigation that caused the revocation in the first place and ask whatever questions came up

16

from listening or reading the appellant's side of the story." (JA 373:4-11) Part of

an investigation is attempting to speak with the accused party according to Chief

Knapp. (JA 375:7-13; JA-375:3-15)

> In other words, reviewing the appellant's side, making it
> clear that, like I said, get it back to them within the hour,
> or raises questions so I got to get back to whomever
> caused the revocation in the first place and say, you
> know, what's your response to this?

(JA 374:20-24) When Sergeant Hall and Trooper Hatfield transferred from the

firearms unit and were replaced by Lt. Alaric Fox, this process ceased. (JA 358:17-

359:19) Chief Knapp and Lt. Fox did not have the same working relationship as

between Chief Knapp and Lt. Fox's predecessors. The process returned to its

previous routine where Mazzoccoli would send the next twenty files to the

firearms unit just prior to the hearing. (JA 359:13-19) Chief Knapp then addressed

adding more meetings and ensuring that a second attorney would be on the Board

so that hearings would not be postponed when the requisite attorney to act as

chairman during the proceedings could not be present. (JA 359:20-25) He

experimented with other methodologies to decrease the backlog such as, for

example, devoting one day of hearings to just permit denials as they seemed to

resolve faster than permit revocation hearings. On another occasion Chief Knapp

met with applicants who had been denied for procedural mistakes in filling out

their applications and he told them to reapply as that would be quicker than waiting

17

for a hearing. (JA 364:30-365:12)

Chief Knapp continued to be concerned about the backlog even as he tried different methods of reducing the wait time for a hearing. (JA 384:2-10) To Chief Knapp, a two year wait period is "ridiculous," while waiting three months is probably not "ridiculous." (JA 384:14-16) While three months is "probably good," somewhere between three months and twenty-four months, "from ridiculous to acceptable," he is unsure whether "four is unacceptable." (JA 384:16-18) More frequent meetings result in a decrease in the backlog. (JA 385:19-21) A decrease in the ten-month backlog requires additional efforts. (JA 386:1-11) The Board members are volunteers whom Chief Knapp holds in high-esteem for their dedication. (JA 386:24-387:5)

If the composition of the Board changed, its members would be entirely within the law to meet only once every ninety-days and ignore any consequences to the backlog. (JA 387:14-388:4) See Conn. Gen. Stat. § 29-32b(d).

### C.   Chairman Christopher A. Adams Delegated The Authority Of The Board To Its Administrator With Negative Results

Adams, an attorney, served as Board chairman from August 2005 until he resigned in July 2008. (JA 218) In his position as a full-time staff attorney for the House Republican Office in the General Assembly he assists "caucus members with legislation, amendments, drafting." (JA 218) He reviewed the statutes applicable to the Board when he became chairman. (JA 223) The Board's

18

Executive Director Mazzoccoli performed the administrative functions of the

Board, gathered information on the cases, prepared the cases for hearings, and

worked with the state police to schedule the hearing. (JA 225, 309) While Adams

was chairman he delegated the duties of the secretary and all the authority held by

the secretary under the regulations to Mazzoccoli, except that Mazzoccoli did not

make an independent inquiry into the facts. No one did until the matter was heard

by the Board. (JA 310 -311)  See Conn.  Agencies Regs. § 29-32b-7 ("After receipt

of the appeal the Secretary reserves the right to make a thorough inquiry of the

facts of the appeal.) (JA 542)

Adams was generally concerned that the backlog created implications for

civil rights violations. (JA 232) Kuck discussed adding more meetings to decrease

the backlog but Adams could not be available for more meetings. (JA 302)

Hearings required an attorney serve as chairman so no hearings could be conducted

in Adams' absence. (JA 302) Adams did not find interest in having more meetings

among the Board's volunteer members. (JA 302-303) Meanwhile Kuck attempted

to pursue his duties as secretary to address the backlog. (JA 240)

In May 2007 Adams drafted a letter to Commissioner Danaher (JA 567-568)

expressing the Board's concern, especially Kuck's concern, about the backlog to

determine what the Board and the state police could do to decrease the backlog.

(JA 232)

Adams recommended setting the hearing dates ninety days in advance to allow the state police an additional sixty days to review, and perhaps resolve, upcoming cases but this failed to materialize. (JA 237) It was Adams' hope that by having the state police review cases earlier that the cases that settled later would settle earlier, allowing additional cases to be scheduled for hearing instead of the case that settled just prior to or on the day of hearing. (JA 268) Adams was disappointed in Danaher's September 14, 2008, (JA 603-604) response to the May 14, 2007, letter where Danaher stated in the third paragraph that reviewing the cases earlier would not have a significant effect on the backlog. (JA 239)

Adams met with Danaher, Fox, Mazzoccoli and others about the backlog but Kuck was excluded from that meeting even though he was the Board secretary with the responsibility under the regulations for receiving, making inquiry into, and scheduling appeals.  See Conn. Agencies Regs. §§ 29-32-1 through 29-32b-15 (JA 535-550) "The Secretary of the Board of Firearms Permit Examiners shall be responsible for all secretarial duties defined in sections 29-32b-5 through 29-32b-15." (JA 537) Kuck's name was not mentioned at the meeting despite his prominent role as Board secretary. (JA 241) While Adams was chairman no one performed the scope of the duties reserved for the secretary in the regulations. (JA 241)

20

## II.   THE STATE POLICE ABUSE THEIR DISCRETION IN REVOKING STATE PERMITS

Detective Mattson is granted the discretion by the state police commissioner to revoke permits and has been assigned to the state police firearms unit since 2000, at this point its longest serving member. (JA 314) In the Second Amended Complaint Kuck and Goldberg allege that Detective Mattson holds the opinion that guns should not be possessed by individuals unaffiliated with law enforcement. (JA 162) Detective Mattson denies this allegation in the Answer asserting that her mental status as a state official is privileged. (JA 195) However, she said to Chief Knapp:

> I can't believe such a highly placed law enforcement official as you believes anybody but cops and military should possess guns.

(JA 381:99-18)

### A.   Goldberg's June 27, 2007, Revocation

The state police issued Goldberg a state permit on May 17, 2007, following Wethersfield Police Department Chief James Cetran's approval of Goldberg's April 3, 2007, application for a temporary state permit. (JA 669) The state police revoked Goldberg's state permit on June 27, 2007, citing as cause in the firearms unit database log (a) pending criminal charges (Code 1), (b) police request (Code 7), and (c) unsuitability (Code 22). (JA 665) Goldberg appealed the June 27, 2007, revocation and was issued a hearing date of May 14, 2009, before the Board. While

21

his appeal of the June 27, 2007, revocation was pending, Goldberg applied on January 25, 2008, to Chief Cetran for a temporary state permit. (JA 630-632) Chief Cetran directed WPD Detective Michael J. Connolly, Jr. ("Detective Connolly") to conduct an investigation which occurred between January 29, 2008, and February 4, 2008. (JA 633-634) Chief Cetran approved Goldberg's January 28, 2008, application and issued Goldberg a temporary state permit dated February 4, 2008. (JA 635) Commissioner Danaher notified Goldberg by letter dated February 20, 2008, that the temporary state permit issued to Goldberg by Chief Cetran on February 4, 2008, was revoked for cause pursuant to General Statutes §§ 29-28a(b) and 29-32(b). (JA 636-637) Commissioner Danaher informed Goldberg that the "revocation is the result of your involvement in the June 21, 2007 incident referenced in my June 27, 2007 correspondence to you, a copy of which is enclosed herein." (JA 636-637)

In the time period between June 27, 2007, when the first revocation occurred and February 20, 2008, when the state police revoked the second temporary permit issued to Goldberg on February 8, 2008, the state police database log Code 01 (pending criminal charge), Code 07 (police request), and Code 22 (unsuitability) bases for the June 27, 2007, revocation changed. First, the pending criminal charge cited as cause (Code 01, Code 22) for revocation did not apply after July 30, 2007, as the case was dismissed on Goldberg's first court date. (JA 626) Any criminal

22

history record of Goldberg's arrest erased by operation of law when the court

entered a dismissal on July 30, 2007. (JA 626)  See Conn. Gen. Stat. § 54-142a(b).[3]

Second, the nature of the police request (Code 07) was clarified by the September

25, 2007, letter from Glastonbury Police Department Chief of Police Thomas J.

Sweeney ("Chief Sweeney") to Commissioner Danaher (JA 627, 629) in which

Chief Sweeney confirmed that the state police revoked Goldberg's permit after

receiving reports from Glastonbury Police Department, not a request for

revocation. (JA 628)

    In his letter to Commissioner Danaher dated September 25, 2007, Chief

Sweeney states that he advised state police Detective Mattson on June 25, 2007, of

Mr. Goldberg's arrest, then mailed Goldberg's state permit to the state police. (JA

627, 629) Chief Sweeney summarizes the June 21, 2007, arrest as a case "wherein

a subject, James Goldberg, allegedly entered a restaurant in Glastonbury wearing a

firearm in a manner that alarmed persons present in the restaurant." (JA 627, 629)

To his credit, Chief Sweeney apparently recognizes that openly carrying a firearm

is not prohibited by state law in Connecticut on premises where carrying a pistol or

---

[3] Subsection (d) of section 54-142a provides in part: "Whenever in any criminal case, on or after October 1, 1969, the accused, by a final judgment, is found not guilty of the charge or the charge is dismissed, all police and court records and records of any state's attorney pertaining to such charge shall be erased upon the expiration of the time to file a writ of error or take an appeal, if an appeal is not taken, or upon final determination of the appeal sustaining a finding of not guilty or a dismissal, if an appeal is taken."

23

revolver is not otherwise lawfully prohibited by the premises' owner or by law.

See Conn. Gen. Stat. § 29-35.[4] Otherwise, he would have stated that Goldberg was

arrested for openly carrying a firearm. The Chili's Restaurant had no rule or policy,

posted or otherwise, on June 21, 2007, prohibiting the possession of a firearm,

carried openly or concealed, other than those prohibitions contained in state and

federal laws and local ordinances; otherwise Goldberg would have been arrested

for a felony. See Conn. Gen. Stat. § 29-28(e).[5]

In his September 25, 2007, letter to Commissioner Danaher, Chief Sweeney

asks, only, as regards to the revocation, that "[a]s the legally designated issuing

authority ... [he] be notified of all proceedings pertaining to the revocation appeal

and/or restoration of Mr. Goldberg's permit." (JA 627, 629) As regards to the state

police database log Code 22, Chief Sweeney did request in his September 25,

2007, letter to Commissioner Danaher that the state police take any specific action,

only that Chief Sweeney be kept informed.

### B.    The State Police Revoke Goldberg's State Permit Absent Investigation

---

[4] Subsection (a) of section 29-25 provides in part: "No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28."

[5] Subsection (e) of section 29-28(e) provides: "The issuance of any permit to carry a pistol or revolver does not thereby authorize the possession or carrying of a pistol or revolver in any premises where the possession or carrying of a pistol or revolver is otherwise prohibited by law or is prohibited by the person who owns or exercises control over such premises."

James Cetran has served as a sworn officer of the Wethersfield Police Department for thirty-eight years, the last nine in the capacity of Chief of Police. (JA 393) He issued Goldberg a temporary state permit in 2007. (JA 669) In June 2007 Chief Cetran learned that Goldberg had been arrested and his case dismissed "outright at the time of arraignment." (JA 394) He also learned that Goldberg's state permit had been revoked by the state police. (JA 398)

While Goldberg's case was pending before the Board waiting to be heard, Goldberg submitted an application on January 22, 2008, to the Wethersfield Police Department for a temporary state permit. (JA 630-632) Chief Cetran designated Detective Michael Connolly to review Goldberg's application. (JA 400) In the application Goldberg marked where asked that his permit had been revoked by the state police. (JA 632) Detective Connolly discussed with Chief Cetran how to proceed in reviewing an application for a temporary state permit when Goldberg's state permit was in revocation status. (JA 400) Chief Cetran called Detective Karanda in the firearms unit and asked whether there was any policy or rule that prohibited Chief Cetran from issuing a temporary state permit to Goldberg after his state permit was revoked. (JA 400) Detective Karanda could cite no rule or policy and did not have an answer for Chief Cetran. (JA 400) Chief Cetran then called Lt. Fox as the head of the state police firearms unit who is also an attorney. (JA 401) Lt. Fox told Chief Cetran that there was no rule or policy or statute preventing

Chief Cetran from issuing a temporary state permit to Goldberg after his state

permit was revoked. (JA 402) Chief Cetran described his conversation with Lt.

Fox:

> Barring that check box, there is nothing different on this
> application than an application that I had already
> approved back before May of 2007. So I'm going to
> reject this application, what would my specific reason for
> doping that if, in fact, that check box doesn't mean
> anything? And his answer was basically, nothing. But he
> suggested I didn't – that I don't reissue the state permit.

(JA 405) Chief Cetran issued Goldberg a temporary state permit on February 4,

2008. (JA 635) Through Goldberg, not the state police, Chief Cetran learned that

the state police revoked Goldberg's temporary state permit issued on February 4,

2008, in a notice from Detective Karanda and Commissioner Danaher. (JA 409,

637-637) In the February 20, 2008, notice, Detective Karanda informed Goldberg:

> This revocation is the result of your involvement in the
> June 21, 2007 incident referenced in my June 27, 2007
> correspondence to you, a copy of which is enclosed
> herein. Additionally, as you know, your state pistol
> permit was revoked based upon the June 21, 2007
> incident and is currently under appeal with the Board of
> Firearms Permit Examiners.

(JA 636) Detective Karanda performed no investigation prior to issuing the

February 20, 2008, revocation notice. (JA 390) Instead, according to Detective

Karanda:

> I would say in relation to this temporary permit right
> here, there is no other investigation that went on. It was

26

> just the basic fact that this was issued contrary to the
> revocation that was in place; and without that first issue
> being addressed by the Board of Firearms Permit
> Examiners, this would be null and void.

(JA 390)

To Chief Cetran the twenty-two months that Goldberg had to wait for a

hearing before the Board on the June 2007 revocation of his state permit seemed

"an exorbitant amount of time." (JA402) The hearing was scheduled for May 2009.

(JA 402) To Chief Cetran "it sounded like a no-brainer, especially since [Chief

Cetran] also had knowledge that the judge had ordered his permit to be re-sent to

him or given back to him." (JA 402, 626) Chief Cetran contacted Commissioner

Danaher after learning of the February 20, 2008, revocation as the only issue was

suitability, there being no disqualifications barring Goldberg from holding a state

permit, and since the June 2007 arrest was erased by operation of law, there was no

difference between Goldberg's initial application to Chief Cetran for a temporary

state permit in 2007 and his second application in 2008. (JA 411) The arrest was a

"non-entity," it "doesn't exist." (JA 411) Chief Cetran asked Commissioner

Danaher to look into the matter and review what the state police were doing under

his delegated authority regarding state permit revocations. (JA 414)

In the process of reviewing Goldberg's application and learning that the

Glastonbury Police Department had seized Goldberg's state permit prior to its

revocation and while it was still valid at the time of Goldberg's arrest on June 21,

2007, Chief Cetran concluded that municipal police departments lacked the

authority under the law to seize valid state permits. (JA 422) Prior to Goldberg, the

Wethersfield Police Department seized state permits and sent them to the state

police. The state police would then issue a notice of revocation or not. After

Goldberg, the department modified its procedure and no longer seizes permits at

the time of arrest because the law allows municipal police departments only the

authority to seize illegally possessed state permits and mandates that state permit

holders upon notice of revocation from the state police deliver their state permits to

the state police following notice. See Conn. Gen. Stat. § 29-32(b).[6] In issuing

revocation notices to state permit holders the state police without authority in law

condone the unlawful confiscation of state permits by informing individuals in the

notices of revocation:

> If for any reason you no longer possess the permit (or any
> duplicate permits), you must submit a written, notarized
> statement that states:  (1) You are aware the permit is
> revoked. (2) The reason you are unable to return the
> permit. (3) If for any reason you locate the permit, you
> will return it immediately to the Connecticut State Police
> Firearms Unit. You MUST do this even if your permit
> was confiscated by the State Police or a municipal police

---

[6] Subsection (b) of section 29-32 provides in part: "Upon the revocation of any
state permit or temporary state permit, the person whose state permit or temporary
state permit is revoked shall be notified in writing and such state permit or
temporary state permit shall be forthwith delivered to the commissioner. Any law
enforcement authority shall confiscate and immediately forward to the
commissioner any state permit or temporary state permit that is illegally possessed
by any person."

28

> agency. Any such confiscation must be reported to this office.

(JA 625) The Glastonbury Police Department noted in the June 21, 2007, arrest report that Goldberg's state permit was seized at the time of arrest "for return to the firearms unit." (JA 624) Goldberg's right to carry under his state permit was not revoked until June 27, 2007. (JA 625) The state police accepted a valid state permit confiscated by the Glastonbury Police Department and did not return it to Goldberg.

## ARGUMENT

## I.    STANDARD OF REVIEW

The district court granted summary judgment in favor of the nine Appellees on all Counts, One through Four, of the Second Amended Complaint. Counts One and Two, brought by Kuck and Goldberg, allege facts in support of procedural due process violations against former Board Chairman Adams, current Chairman Corradino, and current Board Secretary Knapp. Goldberg also brings Counts Three and Four alleging procedural due process violations and unlawful seizure of property against the six state police Appellees Danaher, Masek, Fox, Bastura, Mattson, and Karanda.

This Court reviews a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party. Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999). A motion for summary

29

judgment may be granted only if there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56. The role of the Court is to determine whether there are any genuine issues of material fact to be tried, not to decide them. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1224 (2d. Cir. 1994). "The issue is not whether a claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." King v. Simpson, 189 F.3d 284, 287 (2d Cir. 1999) (quoting Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)). "When deciding a summary judgment motion in a civil case, all factual ambiguities must be resolved in the non-moving party's favor and the court may not weigh the evidence, but rather must only determine whether a genuine issue of fact exists for trial." DeFabio v. East Hampton Union Free School Dist., 623 F.3d 71, 81 (2d Cir. 2010).

## II.    THE VOLUNTARY LIMITATIONS OF THE BOARD CANNOT JUSTIFY THE DEPRIVATION OF A STATE PERMIT AS A MEANS OF SELF-DEFENSE

### A.    Overview Of The Board And Procedural Due Process

The Board is an administrative forum that hears appeals from the revocation, denial, and non-renewal of state pistol permits. The discretion of the state police to deny a renewal application for a state permit or to revoke a state permit is subject to the statutory standard of just or proper cause. See Conn. Gen. Stat.§ 29-32(b).

30

(SPA 173) Individuals hold permits conditioned upon "suitability" and ten eligibility factors. See Conn. Gen. Stat. § 29-28(b). (SPA 165-166)

The Board reviews actions taken by local issuing authorities to deny temporary state permits and by the state police to revoke or deny renewal of state permits. The Board orders the issuance, renewal, or reinstatement of the state permit unless it finds that the denial or revocation would be "for just and proper cause." Conn. Gen. Stat. § 29-32b(b). (SPA 175-176) If an individual is ineligible under any one of the ten factors enumerated in section 29-28(b), the Board may not order issuance, renewal, or reinstatement of a state permit to a person because the person is statutorily ineligible. Therefore, the Board only exercises its discretion in appeals from denials and revocations based on a finding by the local issuing authority or the state police that an individual is not suitable. Kuck and Goldberg held protected property interests in their permits at the time of deprivation.

An important constitutional state interest is implicated in the right to keep and bear arms under Article First, § 15 of the Connecticut Constitution.[7] Similarly, an important federal constitutional right is implicated in the right to keep and bear

----

[7] Article First, ¶ 15, provides: "Every citizen has a right to bear arms in defense of himself and the state."

arms under the Second Amendment to the United States Constitution. <u>District of Columbia v. Heller</u>, 128 S.Ct. 2783, 2799 (2008).[8]

"Under the Fifth Amendment's Due Process Clause no person may be deprived of life, liberty, or property without reasonable notice and an opportunity to be heard. The opportunity to be heard must be at a meaningful time and in a meaningful manner. However, the Due Process Clause does not necessarily require that a person be given an opportunity to be heard orally in a testimonial setting; the opportunity for written submissions may be sufficient. The property and liberty interests and legal issues involved determine the kind of hearing necessary. <u>Karpova v. Snow</u>, 497 F.3d 262, 270 (2d Cir. 2007) (citing <u>Mullane v. Cent. Hanover Bank & Trust Co.</u>, 339 U.S. 306, 314 (1950); <u>Mathews v. Eldridge</u>, 424 U.S. 319, 333 (1976); <u>Interboro Inst., Inc. v. Foley</u>, 985 F.2d 90, 93 (2d Cir. 1993)). "The purpose of a pre-deprivation hearing is to ensure that decision-makers have before them the claimant's legal arguments and do not act on a one-sided or otherwise incomplete factual presentation. The nature of the property or

---

[8] The United States Supreme Court held on June 26, 2008, in the case of <u>District of Columbia v. Heller</u>, 128 S.Ct. 2783, 2799 (2008), that "the Second Amendment conferred an individual right to keep and bear arms." The "Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." <u>Id.</u> at 2797. "'[T]his is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence.'" <u>Id.</u> (quoting <u>United States v. Cruikshank</u>, 92 U.S. 542, 553 (1876)). "The Second Amendment declares that it shall not be infringed ...." <u>Id.</u> at 2798.

liberty interest at stake and the legal issues determine the kind of hearing required." Interboro Institute, Inc. v. Foley, 985 F.2d at 93) (citing Mathews v. Eldridge, 424 U.S. at 332).

The state already deprives state permit holders of a pre-deprivation hearing without requiring a particularized showing, as the state does by default in licensing matters, that in a specific case the "public health, safety or welfare imperatively requires emergency action." Conn. Gen. Stat. § 4-182(c).[9] In providing only for post-deprivation procedures the state implies that every revocation of a state permit requires emergency action. From this assumption to the position that a voluntary Board can only be expected to do its best presumes that when a state permit is revoked the deprivation is minimal. Whether or not the interest in a state permit and the right it represents is minimal as compared to the costs of providing timely hearings is a question on which reasonable minds differ in society, in legislatures, and in courts.

"In Kentucky Department of Corrections v. Thompson, the Supreme Court outlined two steps for the examination of procedural due process claims: the first asks whether there exists a liberty or property interest which has been interfered

---

[9] Section 4-166(6) defines a "license" as "the whole or part of any agency permit, certificate, approval, registration, charter or similar form of permission required by law, but does not include a license required solely for revenue purposes."

with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994) (citing Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 106 (1989) (citations omitted). "Although some due process protections stem independently from the Fourteenth Amendment, state law may also create liberty or property interests entitled to due process protections. Sealed v. Sealed, 332 F.3d 51, 55 (2d Cir. 2003).

"Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." Leebaert v. Harrington, 332 F.3d 134, 139-140 (2d Cir. 2003). "In general, 'the Constitution requires some type of hearing *before* the State deprives a person of liberty or property.'" New Windsor Volunteer Ambulance Corps, Inc. v. Myers, 442 F.3d 101, 115-116 (2d Cir. 2006) (quoting Zinermon v. Burch, 494 U.S. 113, 127 (1990)).

"Due process is inevitably a fact-intensive inquiry." Krimstock v. Kelly, 306 F.3d 40, 51 (2d Cir. 2002) (citing Connecticut v. Doehr, 501 U.S. 1, 10, 111 S.Ct. 2105, 2112, 115 L.Ed.2d 1 (1991) ("[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.") "The timing and nature of the required hearing will depend on appropriate accommodation of the competing interests involved." Id (quoting

34

Logan v. Zimmerman Brush Co._, 455 U.S. 422, 434, 102 S.Ct. 1148, 71 L.Ed.2d

265 (1982)).

### B.    The Individual's Interest In A State Permit Prevails In The Mathews v. Eldridge Test

    1.    Krimstock v. Kelly – Probable Cause not Adequate Guarantee

In Krimstock v. Kelly, 306 F.3d 40 (2d Cir. 2002) the plaintiffs challenged

the due process afforded them in the seizure of their motor vehicles post-arrest.

The city defendant's administrative code operated as follows:

> "If a claimant makes a formal demand for the return of
> the vehicle, the City has twenty-five days in which either
> to initiate a civil forfeiture proceeding under the City's
> Administrative Code or to release the vehicle. Even if the
> City chooses to commence a civil forfeiture proceeding
> within the twenty-five day period, however, the
> proceeding is commonly stayed until the criminal
> proceeding concludes."

Id. at 45 (internal citations omitted).  Krimstock plaintiffs waited thirteen to

twenty-three months to challenge the seizures and in the case of a third plaintiff

whose vehicle was seized in April, 1999, the Appellate Court found that by

December, 1999, he "still had received no hearing in the forfeiture action and his

car remained in police custody." Id.  This plaintiff, as a result of the delay, "had

not been given an opportunity to present evidence that a prescription anti-

depressant medication he was taking at the time of the arrest caused the

Breathalyzer test to exaggerate the percentage of alcohol in his bloodstream." Id.

35

The plaintiffs alleged violations of the Due Process Clause of the Fourteenth Amendment and sought "a prompt hearing following the seizure of vehicles, at which the City must demonstrate probable cause that the car was used in furtherance of a crime and that it is necessary that the vehicle remain in the City's custody until the conclusion of the forfeiture proceeding." Id. (internal quotations omitted).

The district court dismissed the Krimstock complaint finding that the plaintiffs' interests were adequately protected, after applying the Mathews factors, by the "probable cause arrest" and the forfeiture proceedings. Id.  However, on appeal the dismissal was vacated and the case remanded for further proceedings. Despite arrests by knowledgeable and trained police officers subject to the standard of probable cause, the interests of the Krimstock plaintiffs were not adequately protected compared to the deprivation.

### 2.    Mathews v. Eldridge - The Due Process Test

In vacating the district court's decision and remanding the case, the Krimstock court applied the three factors set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976):

> "[I]dentification of the specific dictates of due process
> generally requires consideration of three distinct factors:
> First, the private interest that will be affected by the
> official action; second, the risk of an erroneous
> deprivation of such interest through the procedures used,
> and the probable value, if any, of additional or substitute

36

procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

### *i.* **First Mathews Factor**

"The first factor to be considered in the Mathews inquiry is 'the private interest affected by the official action.'" Krimstock, 306 F.3d at 60 (quoting Mathews, 424 U.S. at 335).

The "particular importance of motor vehicles derives from their use as a mode of transportation and, for some, the means to earn a livelihood." Id. at 61. An "individual has an important interest in the possession of his [or her] motor vehicle," which is "often his [or her] most valuable possession." Id. Whether or not there is relief from the "hardship" imposed by the deprivation is another consideration in weighing the first Mathews factor. Id.; see also Ezagui v. City of New York, 726 F.Supp.2d 275 (S.D.N.Y. 2010) (New York City police officer violated plaintiff's Fourteenth Amendment due process rights when his vehicle was seized and held as evidence in a criminal investigation and plaintiff was not given notice and an opportunity to be heard for ten months or more.).

In Krimstock, the city defendant made no provision for situations in which the deprivation would cause a hardship. Id. Another consideration is the length of the deprivation "which increases the weight of the owner's interest in possessing the vehicle." Id. Based upon these considerations, the Krimstock court could not "agree with the district court's cursory assessment of the interest at stake based

37

solely on its observation that the seizure of the vehicles occurred in a jurisdiction that abounds in mass transit facilities." Id. at 62 (internal quotation omitted).

### ii.    Second Mathews Factor

"The second factor to be considered under the Mathews test is 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" Krimstock, 306 F.3d at 62 (quoting Mathews, 424 U.S. at 335).

The Krimstock court expressed concern about the district court's conclusion that "the procedures used by the City - a warrantless arrest and the ultimate forfeiture proceeding - adequately protect plaintiffs against erroneous deprivation of their vehicles." Id at 62.  Although the city defendant narrowly prevailed in this second Mathews factor, it prevailed due to the appellate court's reliance on the arresting police officer's training and ability to identify intoxicated drivers. Id.

The state police rely upon reports prepared by local issuing authorities to revoke state permits. Section 29-32(b) permits the state police commissioner to revoke the state permit or temporary state permit based upon the commissioner's own investigation or upon the request of any law enforcement agency. Commissioner Danaher relied on investigations not completed by the state police to revoke. The state police do not conduct their own investigations of incidents investigated by local police departments. (JA 216:2-11) Goldberg was arrested on June 21, 2007, his permit revoked on June 27, 2007, and his criminal case fully dismissed on July 30, 2007. The state police conducted no independent

38

investigation of the arrest. (JA 676-699)  When the state police finally did conduct

an investigation more than a year later in July 2008 (JA 642-650) and received a

letter from Goldberg's counsel in September 2008  documenting the entire process

(JA 651-658)

Goldberg's permit was returned prior to his scheduled hearing. (JA 659) The

notice of reinstatement to Goldberg indicated: "A review of the facts and

circumstances of the incident involving your Connecticut Permit to Carry Pistols

and Revolvers has been completed. Effective, upon receipt of this notice, your

permit is reinstated." (JA 659) The state police had ample opportunity to

investigate Goldberg at the time of the revocation as indicated in the resources

devoted to attempting to prove that Goldberg lived in Glastonbury rather than

Wethersfield and had "falsified" his permit application when he indicated he lived

in Wethersfield and applied for a permit in Wethersfield. (JA 676-699) This

allegation arose from Glastonbury Police Department Chief Sweeney in a letter to

Commissioner Danaher.

In this letter to Commissioner Danaher, Chief Sweeney reported that Mr.

Goldberg falsely listed a residence in Wethersfield in applying for and holding the

state permit issued on May 17, 2007, in violation of General Statutes §§ 53a-157b,

29-28, and 29-37. (JA 627, 629) ("As of yet, the Firearms Unit has not submitted

an arrest warrant application for the above criminal violations."). To his credit,

Commissioner Danaher did not seek an arrest warrant against Goldberg for making a false statement as requested by Chief Sweeney but neither was Commissioner Danaher reasonably aware that Chief Sweeney's unfounded allegations about Goldberg presented a bias that required an independent investigation by the state police into the grounds for Goldberg's arrest, especially in consideration that the sole misdemeanor charge against Goldberg was dismissed at his first court appearance.

The high likelihood of an erroneous deprivation on the part of the state police is evident in its denial of Kuck's application for renewal of his state permit where Kuck was a member of the Board and had held a state permit since the 1990's and still the state police could not determine whether Kuck was in the United States illegally. When an agency is incapable of the level of investigation required to determine if a public official is in the United States illegally and that agency is willing to deprive an individual of a property interest based on its incompetence or unwillingness to investigate then the risk of erroneous deprivation for all state permit holders requires immediate and prompt accountability and overview by an independent fact-finder such as the Board.

### iii.   Third Mathews Factor

"The third Mathews factor examines 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" Krimstock, 306 F.3d at 64 (quoting Mathews, 424 U.S. at 335).

40

The defendant city in <u>Krimstock</u> argued that its interest lay in "the need to prevent the offending *res* - here, the seized vehicle - from being used as an instrumentality in future acts of driving while intoxicated." <u>Id</u> at 66. In rejecting the relationship of this interest to the retention of the vehicles, the appellate court found:

> Even if driving while intoxicated were considered a matter of 'executive urgency,' the response the City has chosen, requiring the impoundment of vehicles until forfeiture proceedings are terminated, is ill-suited to address the urgency.

<u>Krimstock</u>, 306 F.3d at 66.  The <u>Krimstock</u> plaintiffs were not concerned with the speed of the institution or conduct of the civil forfeiture proceedings.  <u>Id</u> at 68. "Instead, plaintiffs seek a prompt post-seizure opportunity to challenge the legitimacy of the City's retention of the vehicles while those proceedings are conducted."  <u>Id.</u>

### C.    The Government's Interest In Revoking A State Permit Does Not Provide The Protection Asserted

The state police do not use the period of delay to investigate or prepare cases for presentation to the Board. It relies for the substantial part of its cases on investigations performed by local police departments who send in their reports to the firearms unit. In Kuck's case no investigation was performed because the only investigation necessary was a check to determine if he was born in the United States, and, if so whether he had renounced his citizenship or performed an act that

41

would strip him of citizenship, all a matter of record at the United States

Department of State. Despite representations to the contrary, the two cases before

the district court, Kuck and Goldberg, confirm that the state police performed

absolutely no investigation.

### D.    The State Police Had Prior Knowledge Of The Delay But Were Deliberately Indifferent

In <u>Winstead v District of Columbia,</u> 840 F.Supp.2d 149 (D.C. 2012), eleven

District of Columbia employees presented claims to their employer for disability

compensation. <u>Id.</u> at 151. The court found no dispute that the disability benefits

were a protected property interest and that unreasonable delay in the administrative

processing of the claims may constitute a civil rights violation. <u>Id.</u> To prove their

claims the plaintiffs needed to address the claims processing procedures. <u>Id.</u>

Furthermore, they could have attempted to establish by a valid statistical sampling

or otherwise that the delays they encountered were typical of the delays

encountered by similar applicants to the point that a reasonable person would have

to conclude that the District must or should have known of them and did nothing

and was therefore deliberately indifferent to a highly prevalent practice. <u>Id.</u> at 154.

The district court held that the plaintiffs failed to explore any of those or

other factors suggested and based their case solely on the premise that the period of

time between the request for action and the hearing took too long, and this fact

alone was not enough for the court to find that the delay was unreasonable. Id. at 157.

The state police are aware of the backlog and have not implemented any procedures to reduce the delay. (JA 486-488) Instead, due to the personal views of some members within the state police, there continues to be nothing done to reduce the delay. (JA 618)  Secretary Knapp implemented procedures to counter this indifference but, unlike the state police commissioner, who could adopt procedures or policies to decrease the backlog, as secretary he is limited to scheduling.  His concerns in accepting the position of secretary are repeated:

> My feelings/knowledge/awareness of what they are doing, how manipulating they are in using the waiting period to punish things they have no right to do and it causes injustice to innocent, honest people! That offends me! My challenge! Don't expect you agree but my challenge to stop it! Incomprehensible that Commissioner (not this one! Not anyone!) does not have – has not ordered Guidelines for (1) Course (2) Locals (3) SLFU [DESPP Special Licensing and Firearms Unit].

(JA 619)

### E.    B&B Target Center, Gershenfeld, Walters, and Spinelli

In B&B Target Center, Inc. v. Figueroa-Sancha, 871 F.Supp.2d 71 (P.R. 2012), the court addressed the lack of due process afforded in the absence of a pre-revocation hearing and the length of time between the revocation and a post-deprivation hearing. Id. at 74. The district court held that a wait time of six months

after revocation was not reasonable as the plaintiff lost business and was deprived of the opportunity to present his views and arguments on the merits of the revocation. Id. at 79; see also Gershenfeld v. Justices of the Supreme Court of Pennsylvania, 641F.Supp. 1419, 1423 (E.D. Pa. 1986) (attorney prohibited without a hearing from practicing law pending further action by the Pennsylvania Supreme Court) In Gershenfeld, the court held that the Pennsylvania rule under which the Supreme Court of Pennsylvania suspended an attorney from the practice of law without a full adversarial hearing was unconstitutional on its face because it did not allow for a speedy post-deprivation resolution of the attorney's right to practice. Id. at 1428. The court held that the delay is in large part unreasonable because of the severe and irreparable effect on the plaintiff each day he is suspended and the plaintiff is deprived of his livelihood and his reputation is greatly diminished. Id.

In Walters v. Wolf, 660 F.3d 307 (Mo. 2011), the court stated that the pivotal deprivation in the plaintiff's due process claim was the defendants' continued refusal to return Walters' handgun and ammunition after the St. Louis circuit court dismissed the unlawful-use-of-a-weapon charge on October 23, 2007, or sometime thereafter when authorities deactivated the Edmundson County warrant for Walters's arrest. Id. At 310. The constitutionally impermissible deprivation commenced on one of those two dates and, under Lathon, relegation to a post-hoc state tort action to address the deprivation is inherently insufficient.  Id.

44

In <u>Walters</u>, the district court considered return of a firearm and ammunition to the rightful owner a substantial interest. The ruling set forth that if an individual is eligible to possess a firearm, then his rights should not be infringed or unduly delayed. In Connecticut, many applicants are unduly delayed as they wait months and years for a hearing to either receive their permit to carry or have their permit reinstated. (JA 475)

Finally, in <u>Spinelli v. City of New York,</u> 759 F.3d 160 (2d Cir. 2009), the court concluded that a gunshop owner's due process rights were violated when New York City suspended her license without a prompt post-deprivation hearing. <u>Id.</u> at 175.  The City conceded that the investigation and hearing process for suspended gun dealer licenses often took "months or years" to complete.  <u>Id.</u> Spinelli hired a lawyer whose successful negotiations with the city officials resulted in reinstatement of the suspended license after only fifty-eight (58) days. But given that Spinelli's business and livelihood were at stake, the court held that even this delay exceeded the bounds of due process.  <u>Id.</u> at 174; <u>see also</u> <u>Jones v. City of Modesto</u> 408 F.Supp.2d 935 (E.D.Cal. 2005) (withholding massage therapist license and massage establishment license for close to sixty days resulted in loss of income and violation of  right to prompt hearing).

45

### III. THE ABSENCE OF AN INVESTIGATION PRIOR TO REVOCATION NOT ONLY FAILS TO JUSTIFY THE NEED FOR A LENGTHY DELAY IN SCHEDULING A HEARING BUT VIOLATES STATE LAW

The state police did not investigate the circumstances of Goldberg's June 21, 2007, arrest prior to revocation. The state police did not investigate prior to revoking Goldberg's temporary state permit issued on February 4, 2008. The state police did not investigate whether Kuck was illegally in the United States during the time period between the denial of his renewal application and his hearing. Secretary Knapp testified that Detective Mattson told him that only law enforcement and military personnel should possess firearms and she is the longest serving member of the firearms unit. Since the Board is a volunteer organization with limited resources the duty on the part of the state police is even more crucial because a baseless revocation with no follow-up investigation will necessitate a deprivation of long duration. The failure to investigate and the due process violation inherent in the delay are directly connected.  The state fails to provide resources so that its residents' rights are protected and then claims that it can do nothing to prevent the violation of rights because its resources are limited. The test is what the right requires not what the state can provide.

46

## IV.    STATE LAW DOES NOT AUTHORIZE LOCAL POLICE DEPARTMENTS TO SEIZE STATE PERMITS

Chief Cetran of the Wethersfield Police Department has been in law enforcement for thirty-eight years. Officers in his department do not take state permits because it is against the law. A material issue of fact exists such that a reasonable person could find that when the state police accepted Goldberg's state permit confiscated by the Glastonbury Police Department, the state police violated Goldberg's Fourth Amendment right against unlawful seizure.

## **CONCLUSION**

For the foregoing reasons and arguments Kuck and Goldberg respectfully request that the Order granting summary judgment in favor of the Defendants be reversed, the judgment vacated, and the matter remanded to the district court for further proceedings.

_____
Rachel M. Baird
Attorney for Plaintiffs-Appellants

Dated:  March 20, 2013

48

## <u>CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)</u>

1.      This brief complies with the type-volume limitation of Rule

32(a)(7)(B) of the Federal Rules of Appellate Procedure. It contains 11,413 words,

excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Rule 32(a)(5) of

the Federal Rules of Appellate Procedure and the type style requirements of Rule

32(a)(6) of the Federal Rules of Appellate Procedure. It has been prepared in a

proportionally spaced typeface using Microsoft Word 2003 in Times New Roman

14 point type.

_____
Rachel M. Baird
Attorney for Plaintiffs-Appellants

Dated:  March 20, 2013

49