# 12-4497-cv

To Be Argued By:
Robert D. Snook
Assistant Attorney General

## IN THE

## United States Court of Appeals

## FOR THE SECOND CIRCUIT

_____

### No. 12-4497-cv

_____

**M. PETER KUCK, Individually & on behalf of others similarly situated, JAMES F. GOLDBERG, Individually & on behalf of others similarly situated,**

*Plaintiffs-Appellants*

v.

**JOHN A. DANAHER, III,** *in his Individual Capacity*, **ALBERT J. MASEK,** *in his Individual Capacity*, **ALARIC FOX,** *in his Individual Capacity*, **BARBARA MATTSON,** *in her Individual Capacity*, **THOMAS KARANDA,** *in his Individual Capacity*, **RONALD A. BASTURA,** *in his Individual Capacity*, **CHRISTOPHER A. ADAMS,** *in his Individual Capacity*, **T. WILLIAMS KNAPP,** *in his Official Capacity as Secretary, Connecticut State Board of Firearms Permit Examiners*, **and JOSEPH CORRADINO,** *in his Official Capacity as Chairman, Connecticut State Board of Firearms Permit Examiners,*

*Defendants-Appellees*,

**JAMES M. THOMAS**, in his Official Capacity, **M. JODI RELL**, in her Individual and Official Capacities, and **SUSAN MAZZOCCOLI**, IN her Individual Capacity,

*Defendants*

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT (New Haven)

---

## BRIEF OF DEFENDANTS-APPELLEES

---

GEORGE JEPSEN
ATTORNEY GENERAL

ROBERT D. SNOOK
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT 06141-0120
Ph: 860-808-5250
Email: Robert.Snook@ct.gov

*Attorney for the Defendants-Appellees*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

COUNTER STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.    The Regulatory Framework for Firearms Permit in Connecticut . . 8

    B.    Plaintiff Kuck's Renewal Application. . . . . . . . . . . . . . . . . . . . . 10

    C.    Plaintiff Goldberg's Permit Revocation. . . . . . . . . . . . . . . . . . . 11

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.    Counts One and Two Fail Because Due Process Was Provided . . . 17

    B.    State Police Officials Not Responsible For The Backlog . . . . . . . . 25

    C.    The Board Acted Energetically to Reduce the Backlog. . . . . . . . . 27

    D.    Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    E.    Count Three – The State Police Properly Investigated and Revoked
        Goldberg's Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    F.    Count 4 – The State Police Did Not Seize Goldberg's Property . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATION OF COMPLIANCE WITH RULE 32(A)(7) . . . . . . . . . . . 43

CERTIFICATION OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........................... 15

Bach v. Pataki, 408 F.3d 75 (2d Cir. 2005) ............................................ 34

Bank of New York Co. Inc. v. Northeast Bancorp, Inc., 9 F.3d 1065
    (2d Cir. 1993).................................................................................... 7

Bussey v. Phillips, 419 F. Supp. 2d 569 (S.D.N.Y. 2006)...................... 40

Celotex Corp.v. Catrett, 477 U.S. 317 (1986)at 32....... .....................14

District of Columbia v. Heller, 554 S.Ct. 570 (2008)...... ................ 18,34

Goldberg v. Danaher, 599 F.3d 181 (2d Cir. 2010) ................................. 2

Goldberg v. Glastonbury, Docket no. 3:07cv1733...........................5,39

Goldberg v. Town of Glastonbury, No. 10-4215-CV, slip op. at 3-4 (2d
    Cir. Dec. 13, 2011).................................................................. 5,13, 40

Gottlieb v. County of Orange, 84 F.3d 511(2d Cir. 1996) ...................... 15

Gyadu v. Workers' Compensation Commission, 930 F. Supp. 738
    (D. Conn. 1996) .................................................................................. 32

Isaacs v. Bowen, 865 F.2d 468 (2d Cir. 1989) ........................................ 32

Kachalsky v. County of Westchester, 701 F.3d 81 (2d. Cir.) 2012....18,19

Knight v. U.S. Fire Ins. Co., 804 F.2d 9 (2d. Cir. 1986) ....................16

Krimstock v. Kelly, 306 F.3d 40 (2d Cir. 2002) ...................................... 31

Kuck v. Danaher, 600 F.3d 159 (2d Cir. 2010)...............................passim

Larkin v. Town of West Hartford, 891 F. Supp. 719
    (D. Conn. 1995) ........................................................................... 14,16

Lipton v. Nature Co., 71 F.3d 464(2d Cir. 1995).....................................14

Loria v. Gorman, 306 F.3 1271 (2d Cir. 2002).........................................38

LoSacco v. City of Middletown, 71 F.3d 88 (2d Cir. 1995)................4, 34

Maloney v. Cuomo, 554 F.3d 56 (2d Cir. 2009)......................................34

Mathews v. Eldridge, 424 U.S. 319 (1976).............................................18

Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574
    (1986).....................................................................................................15

McCloskey v. Union Carbide Corp., 815 F. Supp. 78
    (D. Conn. 1993) ...................................................................................16

McDonald v. City of Chicago, 130 S.Ct. 3020 (2010).....................18,33

Meiri v. Dacon, 759 F.2d 989 (2d Cir. 1985) ......................................16

O'Connor v. Pierson, 426 F.3d 187 (2d Cir. 2005)................................18

P.C. v. McLaughlin, 913 F.2d 1033 (2d Cir. 1990)...............................33

Richland v. Crandall, 353 F.2d 183 (2d Cir. 1965) .................................7

Saucier v. Katz, 533 U.S. 194 (2001)......................................................33

Sledge v. Kooi, 564 F.3d 105 (2d Cir. 2009) .....................................4, 34

Spinelli v. City of New York, 579 F.3d 160 (2d Cir. 2009)...............19,20

State v. Bailey, 209 Conn. 322, (1988). ..................................................19

**Statutes**

Conn. Gen. Stat. §29-28a(a)...................................................................... 8

Conn. Gen. Stat. § 29-28a(b)................................................................... 8,9

Conn. Gen. Stat. §§ 29-28(b)...................................................................... 8

Conn Gen. Stat. § 29-28(b)(9).................................................................8,9

Conn. Gen. Stat. § 29-29 ............................................................................ 9

Conn. Gen. Stat. § 29-29(d)........................................................................ 9

Conn. Gen. Stat. § 29-30(c) ....................................................................... 9

Conn. Gen. Stat. § 29-30(f) ........................................................................ 9

Conn. Gen. Stat. § 29-32(b)............................................................... 9,35,37

Conn. Gen. Stat. § 29-32b(a)..................................................................... 10

Conn. Gen. Stat. § 29-32b(b) ................................................................. 9,36

Conn. Gen. Stat. § 29-32b(d)..................................................................... 10

Conn. Gen. Stat. § 29-32b(f) ..................................................................... 10

Conn. Gen. Stat. § 29-32b(g)......................................................................10

Conn. Gen. Stat. § 4-166 *et seq* ............................................................... 10

Conn. Gen. Stat. § 4-166(2)....................................................................... 10

Conn. Gen. Stat. § 4-183 ........................................................................... 10

## <u>COUNTER STATEMENT OF THE ISSUES</u>

1. Did the district court properly conclude that there was no genuine issue of material fact from which a finder of fact could conclude that the delay in hearing handgun permit appeals violated plaintiffs' due process rights?

2. Did the district court correctly conclude that defendant Adams was protected by qualified immunity?

3. Did the district court properly conclude that state police officers may rely on sworn statements from local police departments in conducting investigations?

4. Did the district court properly conclude that the state police officers did not improperly seize Goldberg's firearms permit when they received both the arresting officer's report and the plaintiff's permit simultaneously and then revoked the permit based on the report?

## STATEMENT OF THE CASE

This consolidated action involves claims by two different plaintiffs against a number of state officials primarily related to alleged due process violations. Counts One and Two of the Second Amended Complaint are brought by Plaintiffs Kuck and Goldberg against the Board of Firearms Permit Examiners ("Board") alleging that the actions of the Board in permitting a backlog of handgun permit appeals to develop that required appellants to wait eighteen to twenty months for a hearing violated due process.   JA 164 - 169.  Count Three is brought by Goldberg against several state police officials claiming that the state police procedure for revoking his permit violated due process.   Count Four is brought by Goldberg against the state police for illegal seizure of property. JA 169 - 173.

The original two actions were filed in 2007 and the District Court dismissed them in July, 2008.   SPA 28.   This Court heard separate appeals in 2009 and remanded both back to the district court for further proceedings. *Kuck v. Danaher*, 600 F.3d 159 (2d Cir. 2010)(SPA 148-156); *Goldberg v. Danaher*, 599 F.3d 181 (2d Cir. 2010)(SPA 157-159).

The district court consolidated the two cases on August 17, 2011, and granted partial motions to dismiss on September 29, 2011. SPA 1 – 80.

On October 13, 2011, Plaintiffs Kuck and Goldberg filed a Second Amended Complaint in four counts. JA 120-175. It is important to note that there are two separate sets of defendants. John A. Danaher III, Alaric Fox, Albert Masek, Jr., Barbara Mattson, Thomas Karanda, and Ronald Bastura are or were members of the Connecticut State Police, then part of the Department of Public Safety (the "DPS Defendants"). JA 123 - 125. Christopher R. Adams, Joseph Corradino and T. William Knapp, (the "Board Defendants", together with the DPS defendants collectively "Defendants"), are or were members of the Board of Firearm Permit Examiners ("BFPE" or the "Board")(JA 125-126).

The Defendants filed a motion for summary judgment and the district court granted summary judgment on October 16, 2012. SPA 81 - 146. This appeal followed.

By way of relief, Plaintiffs' Second Amended Complaint sought money damages, injunctive relief and attorney's fees. JA 174. The district court concluded that the only Board official sued in his

individual capacity from whom money damages could be had was protected by qualified immunity.    SPA 138-140.    Plaintiffs have not briefed this issue on appeal and, therefore, any claim for money damages against the board has been waived. *Sledge v. Kooi*, 564 F.3d 105, 106 n.1 (2d Cir. 2009); *LoSacco v. City of Middletown*, 71 F.3d 88, 92-93 (2d Cir. 1995).

This leaves only Plaintiffs' claims for injunctive relief.    Plaintiffs' principal claim is that an 18 to 20 month delay in hearing an appeal violates due process. JA 164-169.  The undisputed facts do not support such a claim.  Plaintiff Kuck, who actually was a member of the Board of Firearms Permit Examiners, was denied his permit because he chose not to file proof of citizenship, part of the standard permit process incumbent on every person getting a firearms permit in Connecticut, including Commissioner Danaher, a named defendant in this case. JA 454-455, 209, 332-333; See also *Kuck v. Danaher*, 600 F.3d 159, 162 (2d. Cir. 2010)(SPA 148-156).  In fact, this Court noted that Kuck did receive his permit as soon as he filed proof of citizenship. *Kuck v. Danaher*, 600 F.3d 159, 162 (2d. Cir. 2010)(SPA 151).  Thus, any delay suffered by

Kuck in obtaining his permit was solely due to his refusal to file the necessary paperwork.

Plaintiff Goldberg, on the other hand, had his permit revoked by the state police because of an arrest for breach of peace by Glastonbury police. JA 665. Plaintiff Goldberg brought an action in federal district court against the Glastonbury police and, after a hearing, Judge Underhill found that the police had adequate probable cause to arrest and dismissed the case. JA 712-714, *Goldberg v. Town of Glastonbury, et al.* Docket No. 3:07-cv-01733 (SRU). This Court upheld Judge Underhill's decision on appeal. JA 719-720, *Town of Glastonbury*, No. 10-4215-CV, slip op. at 3-4 (2d Cir. Dec. 13, 2011). It is difficult to complain that the state police wrongfully failed to return Goldberg's permit pending a decision in a separate action that was ultimately concluded in the Town police department's favor.

The Second Amended Complaint is set up as a class action but no class has ever been certified. JA 122-123, 167-169. The primary source for Plaintiffs' allegations of delayed appeals comes from the reports of the Connecticut Auditors of Public Accounts cited in the Second Amended Complaint. JA 142, 143, 153; SPA 119. As the district court

found, however, the actual numbers in the Auditors reports differ markedly from the numbers cited in the Second Amended Complaint. SPA 119, 126.  In fact, the Board was at one point hearing more than twice as many appeals as Plaintiffs suggested.  SPA 126.  More than that, the facts as developed upon remand tell a more detailed story and give a clearer picture about why there was a backlog of appeals.

As the district court below noted, the permit appeal delay was largely created by major and unexpected increases in permit denials and revocations resulting from a huge increase in handgun permits largely caused by the events of September 11, 2001, the Cheshire home invasion and the election of President Obama.  SPA 127, JA 294, 315, 336, 443-444, 450, 474, 486, 503. State officials reacted quickly and Board members and state police officials were in discussions trying to address the delay issue. JA 232-233, 567.  As will be detailed in this brief, many times appeals were delayed by reasons outside of state officials' control.  For example, close to one third of the parties filing for an appeal never filed all of the necessary paperwork and abandoned their appeals.  JA 486, 503. Others were held up because of pending criminal cases or restraining orders that statutorily prevented issuance

of a firearm permit.  JA 329, 331, 336, 443–444, 454-456.  In any event, both the state police and the Board made repeated and sincere efforts to reduce the backlog of cases and increase the number of hearings, ultimately, these efforts were successful and the appeal period dropped to as low as 8 months.  JA 208-11, 232-233, 334-336, 385-386, 443, 439, 450, 519-520.  Thus, there is nothing to enjoin.[1]

The district court's 56 page detailed decision clearly identifies the lack of support for Plaintiffs' allegations and the extended efforts made by the state officials to fix the backlog problem.  SPA 81 – 146. The district court correctly concluded that the state's actions were reasonable and that the necessary elements of a due process challenge were not met. *Id.*

---

[1] *Bank of New York Co. Inc. v. Northeast Bancorp, Inc.*, 9 F.3d 1065, 1067 (2d Cir. 1993)("In general, an appeal from the denial of a preliminary injunction is mooted by the occurrence of the action sought to be enjoined. *Richland v. Crandall*, 353 F.2d 183 (2d Cir. 1965).")

## STATEMENT OF THE FACTS

As noted by the district court, the facts underlying this consolidated case "are relatively straightforward and not in dispute." SPA 89.

### A.    The Regulatory Framework for Firearms Permit in Connecticut

In order to obtain a permit to carry a pistol in Connecticut a person must apply to the local authority, such as chief of police. Conn. Gen. Stat. §§ 29-28(b), 29-28a(a), SPA 165-168. The local authority is required to issue a temporary permit unless specific statutory exclusions are present, including if the applicant is "an alien illegally or unlawfully in the United States." Conn. Gen. Stat. § 29-28(b)(9). SPA 165-167. Once a temporary state permit to carry is issued, the application is sent to the Commissioner of Public Safety. Conn. Gen. Stat. § 29-28(b); Conn. Gen. Stat. § 29-28a(b); SPA 165-168.

All applications for a permanent state permit to carry a pistol are sent to, and processed by, the Special Licensing and Firearms Unit ("SLFU") within the Office of Administrative Services now within the Department of Emergency Services and Public Protection, then known

as the Department of Public Safety ("DPS").   Conn. Gen. Stat. §§ 29-28a(b); 29-29; SPA 168-169; JA 123-124, 442.

State permits to carry a pistol or revolver expire after five years. Conn. Gen. Stat. § 29-30(c); SPA 171.  Within ninety days before the expiration, the issuing authority sends a notice and a renewal form for the permit.   Conn. Gen. Stat. § 29-30(f); SPA 171.   State statute mandates that the Commissioner "investigate each applicant for renewal for a state permit to ensure that such applicant is eligible under state law." Conn. Gen. Stat. § 29-29(d); SPA 169.

Under Connecticut law the Commissioner of Public Safety may revoke a state pistol permit "for cause" and "shall" revoke a permit upon a finding of certain statutory disqualifiers such as:

> upon conviction of the holder of such permit of a felony or of any misdemeanor specified in subsection (b) of section 29-28 or upon the occurrence of any event which would have disqualified the holder from being issued the state permit or temporary state permit pursuant to subsection (b) of section 29-28.

Conn. Gen. Stat. § 29-32(b)(SPA 175-176).

Any person aggrieved by the revocation or denial of a pistol permit by the SLFU may bring an administrative appeal to the Board of Firearm Permit Examiners (the "Board").  Conn. Gen. Stat. § 29-32b(b);

SPA 175-176; JA 449.   The Board is comprised of seven volunteer members appointed by the Governor, from nominees submitted by a variety of organizations and agencies.   Conn. Gen. Stat. § 29-32b(a), (g); SPA 175-176.

The Board hears its appeals *de novo*, in an "informal fashion," but "otherwise according to the rules of evidence," with a full transcript and witnesses testifying under oath.   Conn. Gen. Stat. § 29-32b(b), (e); SPA 175-176; JA 439.   The Board may compel attendance of witnesses to its sessions.   Conn. Gen. Stat. § 29-32b(d); SPA 175-176.   Because Board hearings are "contested cases," the state's Administrative Procedures Act, Conn. Gen. Stat. § 4-166 *et seq.* applies to the Board's proceedings. *See* Conn. Gen. Stat. § 4-166(2).   Anyone aggrieved by a decision of the Board may file an appeal to superior court pursuant to Conn. Gen. Stat. § 4-183.   Conn. Gen. Stat. § 29-32b(f); SPA 175-176; JA 439.

### B.   **Plaintiff Kuck's Renewal Application.**

On March 19, 2007, Plaintiff Kuck filed an application for renewal of his handgun permit with DPS.   JA 126.   As a generally applicable requirement that became part of the permit process after September 11, 2001, Kuck was asked to provide proof of U.S. citizenship or legal

residency.  JA 128-130; 454-455, 332-333, 560.  Kuck refused to provide the required documents and his application was not processed. JA 128-130; 560; 454-455.  Kuck appealed and was informed in April 20, 2007, that his appeal hearing would be heard October 9, 2008.  JA 129-130.  In his first appeal to this Court, this Court took note that:  "Shortly before the hearing, he provided a voter registration roll supporting his citizenship and residency status; as a result, his renewal application was granted." *Kuck v. Danaher*, 600 F.3d 159, 162 (2d. Cir. 2010), SPA 151.

Plaintiff Kuck's Second Amended Complaint notes that an audit performed by the Auditors of Public Accounts issued at approximately the same time revealed wait times for hearings before the Board from between fourteen (14) to sixteen (16) months.  JA 142 - 143.

### C.    **Plaintiff Goldberg's Permit Revocation.**

Plaintiff Goldberg obtained a temporary license to carry a pistol in April 2007, and obtained a permanent license from the SLFU on May 17, 2007.  JA 131-132.  A month later, on June 21, 2007, Plaintiff Goldberg was arrested by the Glastonbury Police Department for breach of peace at a Chili's Restaurant because he allegedly revealed

his pistol to the hostess. JA 132-133; JA 622-624.   At the time of his arrest, the Glastonbury Police Department seized Plaintiff's pistol and his pistol permit. JA 132-133, 624. On June 25, 2007, the Glastonbury Police Department forwarded a letter to SLFU regarding Plaintiff's arrest, and the same day, SLFU issued a revocation letter to Plaintiff, revoking his pistol permit, because of his involvement in the June 21, 2007 incident. JA 133; 621-624, 625. In the revocation letter, SLFU required the Plaintiff to surrender his permit within five days and acknowledged that the permit "may have been 'confiscated by ... a municipal police agency." JA 134; 625.

On July 30, 2007, Plaintiff appeared before the state criminal court on the June 21, 2007 charges. JA 135. Although the state court (Norko, J.) accepted the nolle and dismissed the criminal charges, it nonetheless required the forfeiture of Plaintiff's weapon and, with respect to Plaintiff's request for the return of the pistol permit, the court held that it was "not ordering the return of the permit if it has been seized by any agency other than the Glastonbury Police Department." JA 135-136; 626.

Goldberg brought an action against the Glastonbury Police Department in federal District Court, alleging illegal search and seizure. JA 133. After a hearing, this suit was decided in favor of the Glastonbury Police Department with Judge Underhill specifically concluding that there was probable cause for an arrest for breach of peace. JA 711-714. Judge Underhill's decision was upheld on appeal, this Court finding, *de novo*, that there was reasonable suspicion sufficient to support the initial stop and that the defendant police officers were entitled to qualified immunity. JA 717, 720; *Goldberg v. Town of Glastonbury*, No. 10-4215-CV, slip op. at 3, 4 (2d Cir. Dec. 13, 2011).

## SUMMARY OF ARGUMENT

There has been no violation of due process in this case because the delay in firearms permit appeals hearings was caused, not by any action or inaction of any of the Defendants, but because of a sudden and unanticipated increase in revocations and denials related to the massive increase in handgun permits sought after the events of September 11, 2001, a major high-profile home invasion in Cheshire, Connecticut and the election of President Obama. SPA 127, JA 294,

336, 443-444, 450, 474, 486, 503.    Faced with a major influx of appeals, state police officials and the Board sought to improve the efficiency and effectiveness of their procedures.    JA 210, 211, 232, 236-37, 239, 241, 450-451, 505-506, 519-520.    While initial efforts had only minor success, eventually the means were found to correct the problem and the backlog was largely eliminated. JA 450, 519-520, SPA 134.

With regard to the Plaintiff Goldberg's specific claims, the record clearly shows that the state police conducted a proper investigation resulting in his permit revocation. JA 215-216, 318-19, 388, 444, 454-457. Finally, any claim for improper seizure of his permit should not be directed against the Connecticut State Police who had not role in the seizure of his permit whatsoever.

## STANDARD OF REVIEW

An appeal of a district court's grant of summary judgment is de novo.  A moving party is entitled to summary judgment if there is no genuine issue or dispute as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322; *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir. 1995); *Larkin v. Town of West Hartford*, 891 F. Supp. 719, 723 (D. Conn. 1995).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary disposition

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

As the Supreme Court has emphasized, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Thus factual disputes that are irrelevant or unnecessary to the resolution of the legal issues shall be disregarded in a motion for summary judgment. *Anderson*, 477 U.S. at 248.

To defeat the motion, the nonmoving party must show more than that "some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "A party may not 'rely on mere speculation or conjecture as to the true nature of facts to overcome a motion for summary judgment.'

" *McCloskey v. Union Carbide Corp.*, 815 F. Supp. 78, 81 (D. Conn. 1993) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12, (2d. Cir. 1986) *cert. denied*, 480 U.S. 932 (1987). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars would necessitate a trial in all Title VII cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985). Moreover, "summary judgment must be entered against 'a party who fails . . . to establish the existence of an element essential to [its] case, and on which it will bear the burden of proof at trial,' " *Larkin*, 891 F. Supp. at 723, *aff'd without opinion*, 101 F.3d 109 (2d Cir. 1996)(Citations omitted.)

## ARGUMENT

The district court properly granted summary judgment because, based on the facts alleged in the Second Amended Complaint and as set forth in the affidavits attached to Defendants' Motion for Summary Judgment, there is insufficient evidence to support any of the four counts. Counts One and Two of the Second Amended Complaint fail because the Board Defendants acted reasonably and responsibly in replying to an unexpected and overwhelming increase in the appeals

docket and ultimately procedures were emplaced that resolved the problem. Counts Three and Four of the Second Amended Complaint fail because the undisputed evidence demonstrates that DPS conducted the investigation required by state law and that Goldberg's arrest was supported by probable cause.

### A.    Counts One and Two Fail Because Due Process Was Provided

State officials provided due process because they responded reasonably to an unexpected surge in permit appeals caused a material backlog of cases and, when the delay became evident, they acted diligently to correct the problem. JA 210-11, 232-233, 236-37, 239, 241, 450-451, 505-506, 519-520. Over time it became clear that in as many as 30% of cases, the delay was caused, not by the state, but by the appellants. JA 443-444, 486, 503. In other cases, government officials were prevented by law from returning permits because the appellants were statutorily prohibited for a time from owning handguns because of restraining orders and similar reasons. JA 329, 331, 336, 443–444, 454-456, 503.

The law is clear that to establish a violation of procedural due process, a plaintiff must show that he or she had a legally protected

liberty or property interest and that the state defendants denied him that interest *without due process of law*. *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005). In evaluating these claims, courts apply the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), balancing "(1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; (3) the government's interest, including the possible burdens of alternative procedures." *O'Connor*, 426 F.3d at 197.

The private interest at stake in this case is described in the Plaintiffs' Brief as "their right to carry outside the home for self-defense." Plaintiffs Brief at 8. This right is not unlimited, however, and courts have recognized that public safety and other factors may permit restrictions on this right. *Heller*, 554 U.S. at 627 n.26; *McDonald*, 130 S. CT. at 3047. See also, *Kachalsky v. County of Westchester*, 701 F.3d 81,88-89, 94 (2d. Cir. 2012). Additionally, it is important to note that the core element of this right, to bear arms in one's own home for personal defense is not implicated in any manner in this case, which involves only the right to carry a handgun outside the

home. This is important because this circuit has held that a less-than-strict scrutiny review is appropriate with questions outside the "core" protections of the Second Amendment. *Kachalsky,* 701 F.3d at 97-98. Further, unlike *Spinelli v. City of New York*, 579 F.3d 160, 174-76 (2d Cir. 2009), the case primarily relied upon by the Plaintiffs, neither Kuck nor Goldberg needed a firearms permit to make a livelihood.

As for the third element of Matthews, there is no dispute that the State has a significant interest in regulating the ownership of firearms, and in its review of the earlier appeal in this case, this Court recognized the importance of the State's interest. *See State v. Bailey*, 209 Conn. 322, 346 (1988).

The central issue in this case therefore involves primarily the second of the Matthews factors, specifically, the risk of an erroneous deprivation of a protected interest through the procedures used by the state police and the Board and the probable value of any alternative procedures, and the third Matthews factor, whether any delay was egregious and without any rational basis in light of the factual record developed by the parties on summary judgment. The Plaintiffs' Second Amended Complaint, based largely on the reports of the Auditors of

Public Accounts, claims that the procedures and practices of the Board resulted in an extensive backlog of permit appeals that, by its very length, violated the Plaintiffs' Second Amendment rights. JA 164 – 169, JA 487. Plaintiffs further allege that the practices and procedures of the state police exacerbated the backlog. JA 139, 164-166.

This Court, in reviewing these claims previously on an appeal of Defendants' motion to dismiss, expressed serious reservations about the eighteen month delay in processing permit appeals in light of the Court's decision in *Spinelli v. City of New York*, 579 F.3d 160, 174-76 (2d Cir. 2009). SPA 153-154. While solicitous of the state's interest in ensuring the safety of the public, the Court believed that the State had failed to explain "why it requires up to twenty months to address appeals. . . . [T]he state must articulate some reason, tied to this interest, that justifies the lengthy period necessary to resolve these appeals." *Kuck v. Danaher*, 600 F.3d at 166; SPA 155.

Following remand and the development of a factual record through Defendants' motion for summary judgment, the district court conducted a thorough review and found that the undisputed facts tell a more complete story.

The district court addressed the principal data relied upon by the Plaintiffs, specifically, the reports of the Auditors of Public Accounts. SPA 96-104, 119-120. There were five such reports prepared by the Auditors over the relevant period. The first report was issued in 2001 and covered the 1999-2000 fiscal year and the last was released August 10, 2011 for the 2009 and 2010 fiscal years. See, JA 458-512. The court tabulated the results of its analysis in a table that showed that over the relevant years there were hundreds of requests for appeals climbing from a low of 187 in 2001 to a high of 361 in 2009. SPA 104. Many appeals were cancelled or otherwise resolved, again from a low of 68 to a high of 281. *Id.* Finally, the Board heard as few as 39 to as many as 149 appeals each year. *Id.* The backlog, which started in 2001 at 3 months long, reached a peak of 20 months in 2004 and dropped to 10.5 months by 2010. *Id.*, JA 519-520.

Interestingly, the 2001-2002 report for the fiscal years 2001-2002 noted that the appeal delay period had grown to 14 months and attributed at least part of that to the number of new permits after September 11, 2001. JA 475. The Board's response to the report clearly shows that the Board was aware of the problem and was willing to take

steps to address it. The report noted: "The Board recognizes the cause for the time lag . . . and is attempting to reduce it" by, among other things, "[i]ncreasing the number of appeals heard at a meeting" and "increase[ing] the number of meetings held each year." JA 476. Additionally, the "Board has and will continue to take steps to improve its members' attendance at hearings. The Board Chairman has informed members of the importance [of] attendance at meetings . . . ." JA 477.

The report for fiscal years 2003 and 2004 expressly noted that the number of appeals had climbed 60% for reasons including "the destruction of the World Trade Center and a higher frequency of permit denials from the local authorities." JA 486. This report also noted that about 30% of appellants do not provide the necessary follow-up paperwork to continue their appeals. *Id.* What the report does not explain is that permit denials by local police authorities are not processed through the state police but go directly to the Board. JA 443. These appeals, which the Auditors noted were occurring with "higher frequency," were wholly outside the control of any of the Defendants in this case. JA 486. Later reports noted that the Board had responded to

22

the backlog by materially increasing the number of hearings.  JA 505-506, 519-520.

The Plaintiffs' having chosen essentially to prove their case with data generated by the Auditors as alleged in their complaint, the district court, after carefully reviewing that data, concluded that:

> the only evidence that Plaintiffs introduce relevant to this second factor are the reports by the Auditors of Public Accounts.  The statistics from the audit reports significantly differ from the statistics that Kuck had previously provided in his complaint and relied upon by the Second Circuit.  The statistics that Kuck and provided in his complaint significantly overstated the amount of appeals which were resolved or cancelled prior to a hearing as well as understated the amount of appeals actually heard by the Board.

SPA 119, 126.  Moreover, the court accurately noted that the statistics "alone are suspect as they do not take into account the reasons for the resolution or cancellation . . . and therefore cannot truly be a proxy for the arbitrariness of DPS's decision-making."  SPA 120.

In addition to the raw numbers provided by the Auditors' Reports, the facts show that, over time, there have been significant increases in the number of Connecticut citizens seeking to own a handgun and as of the time of the motion for summary judgment, there are in excess of

160,000 permit holders. SPA 104; JA 443. The facts also reveal that major and unexpected increases in permit applications occurred after the attacks of September 11, 2001, after the presidential elections of 2008, and as a result of the high-profile Cheshire murders. JA 294, 315-316, 336, 443-44, 450, 474, 486, 503, SPA 108. The Auditors' reports fully acknowledge that the attacks of September 11, 2001 contributed to the sudden increase in permits requests. JA 475, 486, 503. In fact, in 1998 the backlog barely exceeded 3 months. JA 450. By 2003, after September 11th, it reached 16 months and during the relevant time, specifically 2006-2008, it varied between 14 and 20 months. JA 450, SPA 104. As the trial court noted, "[i]n 2002, the number of requests for appeals increased from 187 the year prior to 314 which represented a 60% increase." SPA 127. Year after year, more and more cases entered into the system and simply overburdened the Board. JA 315, 443-444, 450. The Board operated as an effective volunteer-based appeal system and worked well for thirty years. However, as the number of permit applicants increased unexpectedly, the number of denials and revocations inevitably increased, which

resulted in significant and unplanned burdens on the Board and DPS. Both organizations, in turn, reacted aggressively to correct matters.

## B.    State Police Officials Not Responsible For The Backlog

Plaintiffs claim that state police officials were deliberately indifferent to the growing backlog. Plaintiffs Brief, p. 42. As an initial matter, DPS is entirely independent of the Board of Firearms Permit Examiners and has no authority or control over the Board's docket of over scheduling matters generally. JA 442. Further, as noted above, a significant number of appeals were generated by permit denials by local police authorities and were completely outside the control of the state police. JA 443, 486, 503. Beyond this, the facts show precisely the opposite of Plaintiffs' contention. For example, Commissioner Danaher, immediately upon taking office in 2007, inquired about methods to reduce the backlog and instructed then-Lieutenant Alaric Fox to address the issue. JA 208, 210-13, 316, 322-324, 326, 603-604. Captain Masek, head of SLFU, also undertook efforts to identify the source of the backlog and correct it. He testified that DPS set up a "triage" system to pull out of the ever-lengthening docket those cases that could be quickly settled. JA 326-29, 334. Several times, despite the shortage

of personnel, efforts were made to cull cases from the backlog that could be addressed prior to hearing.  JA 443, 316, 322-326, 335, 450-51.

On the Plaintiffs' prior appeal, this Court expressed its concern that the data provided by the Plaintiffs suggested that appeals could "sit gathering dust" during an extensive period of delay. SPA 155. It is important to understand that there were several different categories of cases and this affects the length of time for their potential disposition by the state police.  For example, as noted above, citizens seeking a new permit apply initially to the local chief of police.  A significant number of the cases on the Board's docket at any given point are made up of denials of new permits by local police chiefs and SLFU has no authority over local police departments.  JA 443, 475, 486.

A second class of cases involves revocations of existing permits for specific statutory reasons; often referred to as "disqualifiers."  These cases include felony convictions, which result in automatic permit revocation, but also cases involving protective orders and restraint orders.  JA 329, 336, 443, 444, 455-456.  In these cases the revocation is determined by the length of time the order is in effect. During the period of this lawsuit, SLFU procedure was not to address these cases

until the period dictated by the order ceased because SLFU was statutorily barred from returning the permit. JA 329, 331. Finally, a significant number of cases involved individuals who appealed initially, but then did nothing else. JA 443-444, 486. They may never have responded to the questionnaire issued by the Board or to letters sent to them by SLFU. JA 486, 443-444. In fact, even the Auditors of Public Accounts Reports noted that up to 31% of appeals were not advanced by appellants and simply lapsed. JA 486, 503; SPA 101. These appellants may have moved or otherwise lost interest in their cases and thus these appeals would wait on the docket because of the inaction of the appellants, not SLFU or the Board.

Thus it is clear that the number of cases actually heard by the Board was much higher than cited in the Second Amended Complaint and that significant numbers of those cases disposed of prior to hearing were either because the appellants chose not to continue their appeal or because of clear statutory requirements. The record, however, clearly does not support any contention that DPS officials were deliberatively delaying appeals or intentionally creating a backlog. JA 337.

C.    **The Board Acted Energetically to Reduce the Backlog.**

As the Plaintiffs' Brief itself notes, Defendant Adams was concerned about the backlog. Plaintiffs Brief at 19; JA 232-235; 439, 567-568; SPA 130-132. As demonstrated by the letter of May 14, 2007 from the Chairman of the Board to the Commissioner, the Board was aware of the backlog and actively sought ways to reduce it. JA 232, 567; SPA 130-131. It is beyond dispute that the backlog predated Defendant Adams becoming chairman and he actively considered ways to correct it. JA 232, 234-235, 439, 450, 474. However, as the district court noted, "[a]s all courts are well aware, presiding over a hearing where evidence is to be weighed, considered and deliberated as well as drafting a decision requires substantial preparation, work and time." SPA 129. While this is certainly true of a conventional court, it must be borne in mind that the Board of Firearms Permit Examiners consisted of volunteer adjudicators but otherwise conducted itself in a manner directly analogous to a conventional court. Hearings were held in a typically judicial manner according to rules of evidence and were recorded and transcribed as needed. JA 439, SPA 175-176. Oaths were administered, parties were represented by counsel and the Board ruled on admissibility of evidence and ruled on decisions, which could be

appealed to Superior Court.  JA 439, SPA 175-176.  All of this, of course, takes time and effort particularly when the Board was supported by an entire staff of, at best, one and one-half employees.  JA 490.  Susan Mazzoccoli, the sole full time staff member, was individually responsible to prepare files and questionnaires for each appeal, organize all paperwork and correspondence, oversee all docket activity and otherwise run the Board.  JA 310, 449.  As she noted, the waiting period for an appeal was 3 months when she started with the Board in 1998. JA 450.  After September 11, 2001, the delay period significantly increased to between 14-22 months. JA 450, 474, 486.

Even though the Board had a minimal staff and volunteer members, the Board increased the number of hearings and the number of cases heard at each hearing so that more cases could be addressed. JA 451, 490, 505-506, 519-520.  As noted above, the Board on occasion adjusted its docket to hear only cases involving the same questions of law because this allowed the Board to substantially increase the number of cases considered at a given hearing. JA 324, 450.  Adams also met with SFLU officers to implement procedural changes to reduce the backlog.  SPA 131. The result of these efforts during Adams' tenure

was to increase the number of appeals heard and decided up to 82 a year and, overall, the backlog has shrunk to the point that the waiting period was less than 8 months at the time of filing of the summary judgment motion. JA 450. Clearly, not only was there no conspiracy to slow appeals down, the Defendants aggressively acted to correct the matter. JA 450-451.

In sum, no material facts exist that would permit a reasonable finder of fact to conclude that state officials ignored or trivialized the backlog. Nowhere does the law demand prescience of government officials and, as in this case, there were external events outside the control of state officials that had a material role in increasing the backlog even as state officers were working to reduce it.

Ultimately, the district court concluded that:

> The factual record demonstrates that the Board made good faith efforts to cope with their delay problem under resource constraints occasioned by the significant increases in appeal requests and an all, volunteer board with had the prospect of future progress in reducing the delay. Indeed, these very efforts did successfully decrease the delay from 16 months in 2008 to 10.5 months in 2010.

(SPA 134). Nothing in the Second Amended Complaint or the Plaintiffs' Brief contradicts this conclusion of the court.

Interestingly, the Plaintiffs' Brief makes multiple references to the reports of the Auditors of Public Accounts for the proposition that a delay in excess of 90 days is automatically unconstitutional. Plaintiffs Brief at 7. The reports of the Auditors are highly valued by state officials and agencies. However, the auditors are not lawyers or judges, and the reports do not have the force of law. In fact, nowhere do the reports indicate what authority they have for the statement that 90 days is even relevant in any manner. JA 475, 487.

Finally, in the prior appeal of this case, this Court cited *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) as indicating that a 13 month delay period could constitute an unacceptable deprivation of due process. SPA 153. It must be noted that *Krimstock* involved very different factual circumstances. SPA 153-154. Specifically, in that case appellants were denied the ability to use a personal vehicle for over a year, a deprivation of a day-to-day necessity vital to being able to hold a job and function in modern society. *Kuck*, 600 F.3d at 165; SPA 154. However, during the same period, federal decisional law also suggested

that a 24-month appeal period would not trigger constitutional concerns. For example, in *Gyadu v. Workers' Compensation Commission*, 930 F. Supp. 738, 742 n.1, 745, 752 (D. Conn. 1996), *aff'd*, 1997 U.S. App. LEXIS 32222 (2d Cir. Nov. 17, 1997), delays up to two years in providing a workers' compensation hearing did not violated procedural due process. Interestingly, the Court of Appeals opinion in this case cited *Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir. 1989), a case that upheld a nineteen-month delay in resolving Medicare Part B claims. See, SPA 155. Thus, federal courts at the time were giving different answers in cases involved medical coverage and worker's compensation awards, clearly matters of immediate day-to-day importance simply to live. None of these concerns are found in this case and no allegation has been made that either Plaintiff needed a firearms carry permit to work.

**D.    Immunity**

Plaintiffs' Brief nowhere addresses the fact that the court below found that Defendant Adams was protected by qualified immunity. SPA 136-140.

In analyzing a claim of qualified immunity, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-202 (2001). "When it is objectively reasonable for a public official to believe that his conduct is not in violation of a plaintiff's federal rights, that public official is protected by qualified immunity. See *P.C. v. McLaughlin*, 913 F.2d 1033, 1039 (2d Cir. 1990)."

As noted above, the facts show that Defendant Adams worked diligently to increase the number of meetings held and appeals heard and to overall reduce the backlog. JA 232-233; 439, 567-568; SPA 130-132. Beyond this, however, the facts of this case demonstrate that the only Board Defendant sued in his personal capacity, specifically Defendant Adams, had his last Board hearing was on June 12, 2008, fourteen days <u>before</u> the Supreme Court's decision in *Heller*, which established for the first time that the Second Amendment protects the individual right to keep and bear arms and which was issued June 26, 2008, and some two years before the *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010), case, which made the Second Amendment rights in

*District of Columbia v. Heller*, 554 S.Ct. 570 at 626-627 n. 26 (2008), applicable to the states under the Fourteenth Amendment.   JA 439. Thus there was no clearly established Second Amendment right applicable to the states at that time.   Interestingly, controlling Court of Appeals for the Second Circuit precedent <u>as late as 2009</u> stated:   "It is settled law, however, that the Second Amendment applies only to limitations the federal government seeks to impose on this right." *Maloney v. Cuomo*, 554 F.3d 56, 58 (2d Cir. 2009) (citations omitted).   In fact, before *Heller*, it was not the law that the Second Amendment granted an individual right to bear arms.   *Bach v. Pataki*, 408 F.3d 75, 85 (2d Cir. 2005)(citing *United States v. Cruikshank*, 92 U.S. 542, 553 (1875) ("The right of the people to keep and bear arms is not a right granted by the Constitution."))

Plaintiffs' Brief does not address this in the statement of issues on appeal and nowhere discusses immunity is any manner in the brief and therefore this issue is properly deemed waived. *Sledge v. Kooi*, 564 F.3d 105, 106 n.1 (2d Cir. 2009); *LoSacco v. City of Middletown*, 71 F.3d 88, 92-93 (2d Cir. 1995).

### E.    <u>Count Three – The State Police Properly Investigated and Revoked Goldberg's Permit</u>

State law is clear that state police officials may revoke a handgun permit in certain circumstances "based upon the commissioner's own investigation or upon the request of any law enforcement agency." Conn. Gen. Stat. 29-32(b), SPA 175.   In this case, due process was properly provided Plaintiff Goldberg because revocation occurred after the commissioner had conducted an investigation and because a law enforcement agency requested it.  JA 320, 445-446.

Goldberg, however, claims that the DPS Defendants violated Goldberg's due process rights when they revoked Plaintiff's state permit without conducting an investigation" as required by Conn. Gen. Stat. 29-32(b).  JA 169.

SLFU's primary function is the regulation of handguns and related matters including security guard licensing and private investigators.  JA 442.  Local law enforcement officers commonly submit reports of arrests involving firearms to SLFU for review.   JA 444.   In this case, following a telephone call from local police lieutenant and a subsequent letter with an attached police report, it was clear to Detective Mattson that the Glastonbury Police Department was seeking to have SLFU review the incident.  JA  445-446, 621, 320-321 ("[T]hat

was the whole point of the conversation.") In fact, the SLFU database records reflect that Goldberg's permit was revoked at the request of local police. JA 665, 320.    Thus, the terms of Connecticut General Statutes § 29-32b(b) had been met and Goldberg's permit properly revoked.

Beyond this, once a police report is received, SLFU conducts an investigation which, like any other such investigation, is typically based on sworn police reports.    JA 215-216, 318-19, 388, 444, 456-57.  The term "investigation" is not defined in statute and, in the world of law enforcement, can take on a broad range of meanings.  J.A 216, 456-57.  The present case is, in fact, a perfect example.    Glastonbury police arrived on scene in response to a 911 call to investigate an allegation of breach of peace. JA 621-622. They arrested the Plaintiff for breach of peace and ultimately produced a police report regarding that matter.  As is customarily done, the police report was sent to SLFU for its investigation for violations of a separate statute.  JA 621-622.

SLFU reviewed the GPD report pursuant to its statutory authority to determine if the conduct described therein merited revocation and concluded that it did. JA 444-445, 625. Once that was

done, no further investigation was warranted. In this regard, it should be noted that even if the GPD had chosen not to arrest Mr. Goldberg, SLFU, relying on the police report, could have concluded that the conduct involving the handgun, while not perhaps breach of peace, could have met the requirements for revocation under Conn. Gen. Stat. § 29-32(b). JA 444-445. Thus, the investigations, while relying on the same police report, could have had opposite conclusions.

Plaintiffs' Brief, however, asserts, without a citation to any evidence, that the "state police did not investigate the circumstances of Goldberg's June 21, 2007, arrest prior to revocation." Plaintiffs Brief at 46. This is simply not true and is flatly contradicted by the undisputed evidence that state police can, and do, rely on sworn local police reports to conduct an investigation. JA 215-216, 318-19, 388, 444, 454-457.

It appears that Plaintiffs do not believe that state police should rely on local police reports in performing an investigation. While, of course, Plaintiffs may wish it otherwise, state, federal and local police

can and do rely on each other's reports when investigating possible crimes. JA 215-216, 318-19, 388, 444, 454-57.[2]

In sum, no material facts exist that would permit a reasonable finder of fact to conclude that SLFU failed properly to investigate the facts underlying Plaintiff Goldberg's revocation.

### F.    Count 4 – The State Police Did Not Seize Goldberg's Property

As previously noted, it was the Glastonbury Police Department, and not the State Police, that seized Goldberg's handgun and permit. JA 445. The actions of the Glastonbury officers have been exhaustively examined in other federal actions and upheld. The State Police did not even know of Goldberg's arrest and the seizure of his permit until both the police report and permit arrived by mail. JA 445.

Plaintiff Goldberg, however, alleges that a "material issue of fact exists such that a reasonable person could find that when the state police accepted Goldberg's state permit confiscated by the Glastonbury Police Department, the state police violated Goldberg's Fourth Amendment right against unlawful seizure." Plaintiffs Brief at 47.

---

[2] An officer may arrest an individual based on the report by another officer if report is objectively reasonable. *Loria v. Gorman*, 306 F.3 1271, 1292 (2d Cir. 2002)

There are several problems with this argument. Firstly, it acknowledges that it was the Glastonbury Police, not the state police, that took the permit. The DPS defendants only became aware of the confiscation *after* the fact. JA 445. Thus, any concerns about the legality of the permit seizure should be directed to the town police. In fact, Plaintiff Goldberg brought an action in federal district court for the district of Connecticut for various claims against the Town of Glastonbury related to this very incident. JA 704, 717. *Goldberg v. Glastonbury*, Docket no. 3:07cv1733 (SRU). The district court in that case, however, found for the Town holding:

> [H]e placed the gun on his hip in a manner that was visible to . . . those who saw it because the restaurant manager saw and called a 911 operator. . . .
>
> That conduct was perceived, reasonably perceived by those persons at the restaurant as being threatening conduct. It was threatening to them. And by putting the gun on his hip in a visible way, he recklessly created a risk that those in this facility would feel threatened.
>
> He attempted to cover the gun with his shirt because he knew that the sight of it might, in fact, cause others to be frightened or intimidated. He was sitting in the take out area with the gun exposed to view, having already admitted that he,

> or having later admitted that he knew that that
> conduct was potentially threatening to others. . . .
>
> It seems to me that the statute here was
> potentially violated sufficient to give rise to
> probable cause in the police officer's minds that it
> had been violated by the fact that he took the
> steps that I just mentioned.

JA 712, 713. Docket no. 3:07cv1733 (SRU), Transcript 9/17/10, pp. 47-48. This Court upheld this decision finding, on de novo review, that there was reasonable suspicion sufficient to support the initial stop and that the defendant police officers were entitled to qualified immunity. Town of Glastonbury, No. 10-4215-CV, slip op. at 3-4 (2d Cir. Dec. 13, 2011). JA 717, 720. If the arresting officers are entitled to qualified immunity, it is difficult to see why the state police, who did nothing but review the arrest report and conclude that the above described conduct indicated a lack of suitability for a firearms permit, are not also entitled to immunity.

More to that point, the actual claim in the second Second Amendment Complaint is that "the DPS Defendants conspired with the Glastonbury Police Department to commit the criminal act of larceny and condoned the GPD seizure of property. . . ." JA 170. The district court, citing *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y.

2006), noted that to prove a conspiracy claim, there must be an agreement between two or more state actors to act in concert to inflict an unconstitutional injury and an overt act in furtherance thereto. SPA 78. In this case, the telephone call from GPD to DPS occurred *after* Mr. Goldberg's arrest and the confiscation of his permit. JA 445. In fact, the cover letter from Lt. Woessner to SLFU was dated June 25, 2007, and the arrest occurred on June 21, 2007, so there could have been no agreement. JA 621.

Now, however, in his brief, Goldberg seems to claim that the state police's acceptance of the permit was illegal. As noted above, the local police sent the permit along with the arrest report. JA 621-624. The report itself was the basis for the state police's decision to revoke the permit, which they had only because it was sent to them. It seems illogical to require the state police who had just decided to revoke the permit to mail the permit back to the plaintiff, and then send a letter to the Plaintiff instructing him to mail the permit back to the state police.

## CONCLUSION

For all the foregoing reasons, the Defendants move that this Court uphold the decision of the District Court.

Respectfully submitted,

DEFENDANTS,
JOHN A. DANAHER III,
ALARIC FOX, ALBERT J.
MASEK, JR., BARBARA
MATTSON, THOMAS
KARANDA, RONALD A.
BASTURA, CHRISTOPHER R.
ADAMS. JOSEPH CORRADINO
AND T. WILLIAM KNAPP

GEORGE JEPSEN
ATTORNEY GENERAL


By: _____
         Robert D. Snook
         Assistant Attorney General
         Juris # ct10897
         55 Elm Street
         P.O. Box 120
         Hartford, CT 06141-0120
         Tel: (860) 808-5250
         Fax: (860) 808-5347

## <u>CERTIFICATION OF COMPLIANCE WITH RULE 32(A)(7)</u>

I hereby certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure in that this brief contains 8,239 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because it has been prepared in a monospaced typeface (century schoolbook) with 10.5 or fewer characters per inch.

Robert D. Snook
Assistant Attorney General

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that true and accurate copies of the foregoing brief were served by first class mail, postage prepaid, by Brescia's Printing Service in accordance with Rule 25 of the Federal Rules of Appellate Procedure on this 18th day of June, 2013, to the Clerk of this Court and the following counsel of record:

Rachel M. Baird
Craig M. Lovely
Rachel M. Baird & Associate
8 Church Street, Suite 3B
Torrington, CT 06790-5247
Ph: 860-626-9991


Robert D. Snook
Assistant Attorney General

44